**Arthur G. MELLINGER, III,**
NG–23–911–226

v.

**Melvin LAIRD, Secretary of Defense, et al.**
**Civ. A. No. 70–40.**

United States District Court,
E. D. Pennsylvania.
Feb. 16, 1972.

Henry A. Stein, Philadelphia, Pa., for plaintiff.

Barry W. Kershner, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## OPINION AND ORDER

MASTERSON, District Judge.

This is another in the long series of cases involving the activation of military reservists for failure to participate satisfactorily in their units of the Ready Reserve.[1] Private Mellinger enlisted in the Army National Guard on March 22, 1964, thereby incurring a six year obligation which would have expired on March 21, 1970. About 3½ months before his discharge, however, the Army ordered Mellinger to active duty for a period of 15 months, 9 days. The Army activated Mellinger pursuant to 10 U.S.C. § 673(a) and (b) which read as follows:

"(a) Notwithstanding any other provision of law, the President may order to active duty any member of the Ready Reserve of an armed force who —

(1) is not assigned to, or participating satisfactorily in, a unit for the Ready Reserve;

(2) has not fulfilled his statutory reserve obligation; and

(3) has not served on active duty for a total of 24 months.

(b) A member who is ordered to active duty under this section may be required to serve on active duty until his total service on active duty equals 24 months. If his enlistment or other period of military service would expire before he has served the required period under this section, it may be extended until he has served the required period."

By Executive Order No. 11366, the President delegated his authority under this statute to the Secretary of Defense who, in turn, authorized promulgation of A. R. 135–91, which established policies and procedures governing satisfactory participation. In Paragraph 12, the Regulation states that:

"A member fails to participate *satisfactorily when he accrues in any 1-year period a total of five or more unexcused absences from scheduled unit training assemblies* . . ."

Paragraph 5(d) (12) provides that:

"A member present at a scheduled unit training assembly will not receive credit for attendance thereat unless he is in the prescribed uniform, presents a neat and soldierly appearance, and performs his assigned duties in a satisfactory manner as determined by the unit commander."

And, A. R. 600–20, paragraph 31 establishes, in part, the criteria of a "neat and soldierly appearance."

"The hair to include sideburns will be well groomed, cut short or medium length and neatly trimmed at all times."

Private Mellinger found himself within the orbit of this statute and accom-

1. See *O'Mara v. Zebrowski,* 447 F.2d 1085 (3rd Cir. 1971); *Antonuk v. United States,* 445 F.2d 592 (6th Cir. 1971); *Heuchan v. Laird,* 427 F.2d 980 (8th Cir. 1970); *Giannatasio v. Whyte,* 426 F.2d 908 (2nd Cir. 1970); *Anderson v. Laird,* 437 F.2d 912 (7th Cir. 1971); *Smith v. Resor,* 406 F.2d 141 (2nd Cir. 1969); *Raderman v. Kaine,* 411 F.2d 1102 (2nd Cir. 1969); *United States ex rel. Schonbrun v. Commanding Officer,* 403 F.2d 371 (2nd Cir. 1968); *Winters v. United States,* 412 F.2d 140 (9th Cir. 1969); *Byrne v. Resor,* 412 F.2d 774 (3rd Cir. 1969); *Karpinski v. Resor,* 419 F.2d 531 (3rd Cir. 1969); *Johnson v. Powell,* 414 F.2d 1060 (5th Cir. 1969); *Schwartz v. Franklin,* 412 F.2d 736 (9th Cir. 1969); *Winters v. United States,* 390 F.2d 879 (2nd Cir. 1968); *Fox v. Brown,* 402 F.2d 837 (2nd Cir. 1968); *Schultz v. Clifford,* 417 F.2d 775 (7th Cir. 1969), cert. denied, 397 U.S. 1067, 90 S.Ct. 1234, 25 L.Ed.2d 420; *Mickey v. Barclay,* 328 F.Supp. 1108 (E.D.Pa.1971); *Keister v. Resor* (E.D.Pa.1971); *Wilson v. United States* (E.D.Pa.1971); *Krill v. Bauer,* 314 F.Supp. 965 (D.Wisc.1970); *Metz v. United States,* 304 F.Supp. 207 (W.D. Pa.1969); *Harmonson v. United States,* 2 S.S.L.R. 3151 (C.D.Cal.1969); *Giardina v. Ambrose,* 301 F.Supp. 326 (D.Mass. 1969); *Weber v. United States,* 288 F. Supp. 491 (E.D.Pa.1968); *Even v. Clifford,* 287 F.Supp. 334 (S.D.Cal.1968); *Pfile v. Corcoran,* 287 F.Supp. 554 (D. Colo.1968); *Gion v. McNamara,* unreported (Civ.No. 67–1563, C.D.Cal.1968); *Sullivan v. Cushman,* 290 F.Supp. 659 (D.Mass.1968).

panying Regulations on November 9, 1969 when he received his fourth and fifth unexcused absences within a one year period. On that date he participated unsatisfactorily in the morning and afternoon training periods. Ironically he received these critical absences on the *last* day of the one year period in which his first charged unexcused absence (which occurred on November 10, 1968) could have been counted toward the required total of five.[2] The behavior which prompted Captain Snelbecker, Mellinger's Company Commander, to impose two unexcused absences consisted of Mellinger's unjustified lateness at the morning training period and his long and untidy hair and sideburns at the afternoon session.[2a]

More specifically, the evidence before us indicates that on November 9, 1969 Private Mellinger arrived about 40 minutes late for the scheduled morning drill because he overslept.[3] Although Mellinger telephoned his Unit to explain that he would be late,[4] and it was apparently informal company policy to grant excused absences upon a telephone call (prior to the commencement of scheduled activities),[5] nevertheless, Mellinger received a point. Captain Snelbecker explained that Mellinger's lateness was not excused because he, in particular, had been late on other occasions with impunity, and that as the Commanding Officer, he felt a crackdown was necessary.[6]

At the afternoon session, Captain Snelbecker cited Mellinger because his sideburns and hair failed to comply with established military standards. It is undisputed that well before November 9, 1969, the defendants mailed a diagram which clearly depicts acceptable lengths of sideburns and hair to every reservist, including Mellinger.[7] Aside from the diagram, it is also undisputed that Captain Snelbecker personally told Mellinger at the morning assembly that his hair and sideburns were too long and ordered him to at least trim his sideburns before the afternoon inspection.[8] Since November 9th was a Sunday, a day on which it would be extremely difficult to find a barber, Captain Snelbecker decided to tolerate the long hair provided Mellinger made an attempt, using readily available razors, to comply with the regulation on sideburns.[9] Besides Private Mellinger, Captain Snelbecker warned the *entire unit* that they should make an effort to comply with the established standards before the impending inspection.[10] Although other members of the Unit took their Commanding Officer's instructions seriously and immediately trimmed their sideburns during the noontime break,[11] Mellinger did nothing.[12] As a result, Captain Snelbecker imposed

---

2. Mellinger's unit commander charged him with unexcused absences on November 10, 1968, June 14, 1969, June 15, 1969 and two on November 9, 1969.

2a. Mellinger concedes that on February 8, 1969, he signed a document which reads as follows:
"I have this day been oriented on and understand the satisfactory participation requirements and enforcement procedures contained in AR 135–91." (N.T. at 46–47. See Government Exhibit #2. In addition, he participated in a 20 minute class on the subject and later talked to Captain Snelbecker about the meaning of various provisions. N.T. at 47–49. Hence, it is fair to conclude that Mellinger knew and understood that lateness and an unkempt appearance constituted grounds for unsatisfactory participation in the Ready Reserve.

3. N.T. at 39 (March 26, 1971).

4. *Ibid.*

5. Members of the Unit besides Mellinger testified that such a general policy existed. N.T. at 9–12, 26–28, 34–36 and 38. In fact, John A. Stoll, Jr. stated that he overslept and arrived late on the morning of November 9, 1969, but received no points. *Id.* at 25. Peter G. Swift testified that on a prior occasion, he too arrived late, but was not charged with an unexcused absence. *Id.* at 34.

6. N.T. at 63–64.

7. N.T. at 49 and 55. See Government Exhibit #1.

8. N.T. at 41, 60, 67, and 70.

9. N.T. at 66 and 70.

10. N.T. at 55.

11. N.T. at 42.

12. N.T. at 41.

a fifth unexcused absence.[13] And Mellinger's active duty orders soon followed on December 3, 1969.

A month later, Mellinger filed this action in federal court alleging various statutory and constitutional deprivations which, he claims, render his orders to active duty unlawful. He seeks habeas corpus, mandamus, or injunctive relief. On January 16, 1970, we issued a writ of mandamus under 28 U.S.C. § 1361, in effect staying Mellinger's activation orders until he was afforded an opportunity to exhaust his appellate remedies within the military. Presently before this court are three motions; one by the defendants who would have us dismiss his complaint and vacate the mandamus order, and the other two by the plaintiff who seeks either a permanent writ (or injunction) forbidding his activation or, in the alternative, continuation of the temporary mandamus pending the convention of a three judge court to hear various challenges to the constitutionality of 10 U.S.C. § 673. For the reasons developed below, we will grant the defendants' motion and deny those of the plaintiff. In short, it is our considered judgment that we have no basis to restrain the Army from activating Private Mellinger for a period of 15 months and 9 days.

## I.

It is firmly established that a federal court lacks jurisdiction to review discretionary judgments of military officers acting within the scope of their authority.[14] On the other hand, it is equally well settled that the military may not violate their own regulations,[15] an Act of Congress[16] or the Federal Constitution[17] in issuing military orders, and a federal court possesses jurisdiction to prevent such violations. Moreover, because the military's power to issue orders flows entirely from its authority granted by the Federal Constitution, Acts of Congress, and any regulations passed pursuant thereto, it follows that these bodies of law set the boundaries for and limit the legality of *all* military orders whether discretionary or mandatory.[18] To state this proposition another way, no military order may violate the Constitution, Federal statute or Army regulation, and whether or not the order in question constitutes a discretionary determination is irrelevant to this fundamental principle.[19] Hence, whenever a litigant attacks a military order, and such attack is predicated upon violation of regulations, Federal legislation or the Constitution, a federal court *must* review the questioned order itself, including any exercise of discretion, if such review is necessary to determine

---

13. See Government Exhibit #5.

14. See e. g., Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); O'Mara v. Zebrowski, 447 F.2d 1085, 1087 (3rd Cir. 1971).

15. See e. g., Smith v. Resor, 406 F.2d 141 (2nd Cir. 1969).

16. See e. g., Harmon v. Brucker, 355 U.S. 579, 78 S.Ct. 433, 2 L.Ed.2d 503 (1958).

17. See e. g., O'Mara v. Zebrowski, supra note 14.

18. As the Supreme Court noted in Harmon v. Brucker, supra note 16:

The District Court had not only jurisdiction to determine its jurisdiction but also power to construe the statutes involved to determine whether the respondent did exceed his powers. If he did so, his actions would not constitute exercises of his administrative discretion, and, in such circumstances as those before us, judicial relief from this illegality would be available. Moreover, the claims presented in these cases may be entertained by the District Court because petitioners have alleged judicially cognizable injuries. Cf. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 159, 160 [71 S.Ct. 624, 642, 95 L.Ed. 817], and see Army Regulation 615–360, par. 7."

19. Of course, merely to state that all military orders are issued subject to constitutional limitations does not in any way address the question of the *extent* to which constitutional principles apply to military personnel as opposed to civilians. See generally, Anderson v. Laird, 437 F.2d 912 (7th Cir. 1971).

whether in fact the order controverts one of the three controlling areas of law. See Smith v. Resor, 406 F.2d 141 (2nd Cir. 1969).[20]

In this case Mellinger claims that the Army violated both its official regulations as well as the Federal Constitution. We begin with Mellinger's challenges based upon the regulations since a favorable disposition on these points would obviate the need to face constitutional issues.

## II.

◼ The five arguments based upon alleged violations of regulations may be disposed of rather quickly. First, Mellinger contends that the Army violated AR 135–91(20) (e) in not providing him with a personal hearing including representation and right of cross-examination before the Delay Appeal Board, the body which is charged with acting on appeals from active duty orders.[21] Although prior to November 24, 1970 AR 135–91 (20) (e) stated that the provisions of AR 15–6 which afford such a hearing were applicable to proceedings before the Delay Appeals Board,[22] and Mellinger should have received such a hearing under the regulation; nevertheless, in our judgment subsequent events cured this defect.

Aside from his written appeal to the Delay Appeal Board (which the Third Circuit held satisfied the requirements of due process in O'Mara v. Zebrowski, supra), on April 27, 1970 Mellinger received a *personal* hearing under Article 138, Uniform Code of Military Justice, (10 U.S.C. § 938), before Major Harold S. Irwin, Jr., Judge Advocate General Corps. At that hearing he was afforded the opportunity to have counsel present,[23]

testify and cross examine witnesses against him. In substance, Mellinger received every procedural right that should have been afforded to him under AR 15–6.[23a] Moreover, after this "procedurally laden" hearing, Mellinger received a letter from the Acting Chief, Military Affairs Division of the Judge Advocate General Corps indicating that based on the Article 138 hearing, the latter had concluded that Captain Snelbecker did not abuse his discretion or single Mellinger out for special treatment by giving him two unexcused absences on November 9, 1969. In addition to these two hearings, Mellinger was afforded a third appeal, this time to the Inspector General of the Army under AR 20–1. Although the actual report was not made available to Mellinger's counsel, the Adjutant General of the Pennsylvania National Guard wrote to Mr. Stein stating that:

"a. Private Mellinger was not singled out for an unsatisfactory participation charge because he reported late for the morning assembly on 9 November 1969. Charges under similar circumstances were preferred against his his brother, James, and PFC John A. Stoll Jr., who reported approximately 40 minutes after the assembly started.

b. The charge of unsatisfactory participation against Private Mellinger for the afternoon assembly on 9 November 1969 was warranted. He had every opportunity to trim his sideburns, but failed to do so.

After a thorough review of the investigation report it is my opinion that Private Mellinger was counselled on numerous occasions of his obligation to satisfactorily participate in accordance with prescribed directives, but he

---

20. Cf. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954).

21. See Keister v. Resor (E.D.Pa.1971); O'Mara v. Zebrowski, supra 447 F.2d at 1087 n. 5.

22. On November 24, 1970, the Army eliminated the applicability of AR 15–6 to AR 135–91. See First Army Circular 135–7.

23. Henry A. Stein, Esq., elected not to appear at this hearing. He did, however, receive a copy of the transcript.

23a. Compare Higbee v. Laird, 4 S.S.L.R. 3555 (D.N.J.1971).

failed to comply; therefore, it is felt that the actions of the Troop Commander were justified and no further action will be taken by this Office."

In essence, the Inspector General reached the same conclusions as the Acting Chief of the Military Affairs Division who reviewed the Article 138 hearing. Considering these facts, we cannot say that any significant prejudice resulted from the military's apparent violation of this regulation, and we will not restrain the Army from activating him on this basis. See Smith v. Resor, supra.

■ Secondly, Mellinger complains that the Delay Appeal Board did not conscientiously review his case as required under AR 135–91 because in the notice of rejection, the Board used "canned" findings. Counsel for Mellinger has presented us with other similar rejections, all of which read word for word the same as Mellinger's. Although we recognize that the use of standard language does not necessarily impute lack of consideration of the merits of each appeal, in this case we need not face the question because, once again the subsequent hearings under Article 138 and by Inspector General cured any possible defect.

■ Next, Private Mellinger contends that the State Adjutant General violated AR 135–91 when he forwarded Mellinger's name to the area commander for issuance of active duty orders without *"personally verifying the circumstances in each case* and determining that the administrative requirements of this regulation have been complied with . . . ,"* as expressly required by Paragraph 14 (b) (1) (emphasis added). At the Article 138 hearing, the State Adjutant General's deputy stated how he performed his duty with respect to Mellinger's activation:

"We check and make sure that the orientation statement is there; that he has been oriented on the provisions of the regulation; that he has been notified in [sic] each particular absence or for a period of unsatisfactory participation. He knows how many

are charged against him. He knows if he has five that he will be reported for active duty.

We also check his personnel record to see how much active duty training, how many periods of field training he has so that we can determine the period that he is to be reported for active duty for.

If we see that everything is in order and there are five chargeable absences and so on and so forth, we then take it to the Deputy Adjutant General with a briefing statement and he reviews it, asks if everything is in order. We say it is *administratively correct* and then we prepare this request for the Commanding General, First U. S. Army.

Q. Would it be fair to say that the only thing the Unit Commander does in a case like this, is forward to you a letter stating that there are five unexcused absences and then it is up to the people at a higher level to make a determination whether or not this individual should be placed on active duty?

A. Well, our determination is based simply on that the thing is *administratively correct.*" Article 138 hearing at 21–22. (emphasis added).

The precise issues raised by this colloquy are whether the State Adjutant General's admitted failure to personally inquire into the *substance of each unexcused absence* rather than just the administrative details controverts the regulation, and if so, whether such an omission should result in the invalidation of Mellinger's active duty orders.

At best, the regulation reflects ambiguity. But in our considered opinion the scheme of AR 135–91 does not envision review of Captain Snelbecker's discretion at the level of the State Adjutant General. Rather we read the first phrase of paragraph 14(b) (1), "personally verifying the circumstances of each case," as relating to administrative circumstances (i. e., those details outlined in the quoted portion above), rather than

the substantive circumstances of each absence. We reach this conclusion in part because the words "circumstances in each *case*" are used rather than "circumstances of each *unexcused absence*." Moreover, AR 135–91 has a whole paragraph devoted to appeals, and the Delay Appeal Board not the State Adjutant General clearly constitutes the intended appellate body on substantive issues.[24]

Even if the regulation requires the State Adjutant General to investigate beyond administrative details, we still would not restrain the Army on this basis because the omission did not prejudice Mellinger in any significant way. See Smith v. Resor, supra. Three independent groups within the military reviewed the circumstances of Mellinger's two disputed unexcused absences; the Delay Appeal Board, the Article 138 tribunal, and the Inspector General of the Army. And now this court is also considering the circumstances. No citizen whose life is affected by the government could possibly be entitled to more administrative and judicial review than Private Mellinger received in this case.

■ The fourth contention relates to the method of computing absences and the date on which a reservist in violation of AR 135–91 must be ordered to active duty. Specifically, Mellinger contends that because *at the time the active duty orders were issued* (December 3, 1969), he had only four unexcused absences,[25] he could not be activated under AR 135–91. Our analysis of the regulation, however, leads us to conclude that the regulation contemplates merely that the five absences *accrued* within a one year period, not that the *order* itself must be issued within that period. See AR 135–91 (12) (a) and (c). Practically speaking, if we followed Mellinger's suggested interpretation, it would become impossible to order anyone to active duty whose fifth absence occurred on the last few days of the one year period because of obvious administrative delays. And this is clearly not a result contemplated by this regulation.

■ The logic of Mellinger's final objection may be set forth as follows: AR 135–91(12) (2) is mandatory, "A member who fails to participate satisfactorily . . . *will* be ordered to active duty;" testimony indicates that at least one other member of Mellinger's Unit, John Zimmerman, also had five unexcused absences during a one year period, but he was *not* ordered to active duty;[26] therefore, since AR 135–91 does not extend discretion to select among unsatisfactory participants, Captain Snelbecker must have singled Mellinger out for activation contrary to the express language of AR 135–91.

Captain Snelbecker conceded that he knew Zimmerman had received five points and was subject to activation. But he also testified several of them were incurred while he (Captain Snelbecker) was absent from the Unit. When, upon his return, he could not obtain "clear-cut clarification" from his subordinates to satisfy himself that Zimmerman deserved these unexcused absences, he decided that he simply could not in good conscience impose active duty.[27] Aside from this explanation proffered by Captain Snelbecker, Mellinger's logic contains a fatal twist. Just because another should have been activated and was not does not excuse someone who himself is in clear violation of the rule.[28] The relevant question concerns Mellinger, and his conduct, not the conduct or status of others. Moreover, because Zimmerman's situation was so isolated in the Unit, we do not believe that Mellinger was the victim of selective enforcement under AR 135–91.

24. See AR 135–91(20).

25. After November 10th, 1969, his *first* absence could no longer be counted toward a total of five.

26. N.T. at 16–17.

27. N.T. at 63.

28. Cf. Metz v. United States, 304 F.Supp. 207 (W.D.Pa.1969).

## II.

Mellinger raises five constitutional issues in his attempt to circumvent active duty. Two of the issues do not involve challenges to the statute itself, and are therefore clearly cognizable by a single judge. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

■ We begin with Mellinger's assertion that Captain Snelbecker acted arbitrarily and capriciously in imposing the disputed fourth and fifth absences upon him and that this action violates his due process rights under the Fifth Amendment. Undoubtedly, even a person within the military enjoys the protection of due process. See e. g., Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508; O'Mara v. Zebrowski, supra. However, this does not necessarily mean that military personnel are entitled to the same standard of fundamental fairness as civilians.[29] See Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953).

■ But in this case, as in Brown v. McNamara, 387 F.2d 150, 152 (3rd Cir. 1967), we need not decide whether "review of the question of substantive due process which may be presented in any case of a person voluntarily enlisted in military service is as broad as or limited to the 'basis in fact test,' Estep v. United States, 327 U.S. 114, 122–123, 66 S.Ct. 423, 90 L.Ed. 567 (1946); United States v. Seeger, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) . . . .," because the record before us contains sufficient evidence to show that the imposition of two unexcused absences upon Mellinger on November 9, 1969 was not arbitrary, capricious, or irrational.

■ The testimony clearly establishes that Mellinger arrived 40 minutes late, and such behavior unquestionably controverts the precepts of AR 135–91. Moreover, it is irrelevant that others may have arrived late on the same day or on prior days without receiving any points.[30] Although Captain Snelbecker may have no discretion to impose an unexcused absence when no violation has occurred, we hold that for reasons inherent to the military system, he does possess some discretion to impose points upon certain violators and extend "the benefit of the doubt," so to speak, to others.[31] See Metz v. United States, supra. Otherwise, almost every order ever issued by the military would be invalid. Thus, for purposes of due process, the *only*

---

29. A reservist's status seems to fall somewhere in between that of a civilian and that of a soldier on active duty. See Anderson v. Laird, 437 F.2d 912 (7th Cir. 1971) (Reynolds, J., concurring in part, dissenting in part). Consequently, someone in Mellinger's position may be entitled to an intermediate standard of due process.

30. John A. Stoll, Jr. testified that he arrived at 9:00 A.M. on November 9, 1969, but did not receive an unexcused absence. N.T. at 25. He further stated that he was excused on other occasions although he arrived late. N.T. at 27. Peter G. Swift indicated that he arrived late on several occasions but received no citation. N.T. at 35. But even Mellinger's latenesses had been excused on prior occasions. N.T. at 78–79. See also testimony of Article 138 Hearing.

31. "We know that from top to bottom of the Army the complaint is often made, and sometimes with justification, that there is discrimination, favoritism or other objectionable handling of men. But judges are not given the task of running the Army. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfuly inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service." Orloff v. Willoughby, 345 U.S. 83, 93, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

**444**

relevant question is whether Captain Snelbecker's determination that *Mellinger* arrived late on November 9th, 1969 was arbitrary, capricious, or irrational. And the only possible answer is no.[32]

■ Turning to the afternoon session, once again the issue becomes whether Captain Snelbecker's determination that the length of Mellinger's sideburns and hair exceeded military standards was arbitrary, capricious or irrational. And the fact that others may have sported longer hair and sideburns without receiving a citation is irrelevant.[33] Our review of the record convinces us that the Captain acted properly and reasonably. Although Mellinger stated in a general way before this court that he thought he had complied with the regulation all along,[34] his testimony before Major Irwin at the Article 138 hearing belies this conclusion.[35] In that proceeding, Mellinger *admitted* that although the diagram specified that sideburns must not exceed the *center* of the Tragus, his extended to the *bottom* of the Tragus.[36] In other words, he *conceded* that his appearance on November 9, 1969 violated the regulation. Therefore, we must hold that Captain Snelbecker acted reasonably in imposing an unexcused absence.[37]

■ The second constitutional issue involved Mellinger's enlistment contract and whether retroactive application

of 10 U.S.C. § 673 impairs that contract in violation of the Fifth Amendment.[38] Basically Mellinger argues that since his enlistment contract expressly provides that upon unsatisfactory participation in the Ready Reserves he could be activated only for a period of *45 days*, application of 10 U.S.C. § 673, which was enacted *after* his enlistment and allows activation for up to two years, would violate the Fifth Amendment's prohibition against the retroactive impairment of contracts. We disagree.

Unfortunately, the government has been unable to locate Mellinger's enlistment contract for inspection by this court. We note, however, that some contracts of enlistment provide that an enlistee may be activated for a period of 45 days "or as otherwise provided by law"[39] while others permit activation solely for a period of 45 days.[40] It has been held, and we agree, that where the contract contains the language "or as otherwise provided by law" that the contract thereby contemplates application of *future* as well as present laws of the United States, and hence a two year activation period impairs nothing. See Winters v. United States, 281 F.Supp. 289 (E.D.N.Y.), aff'd per curiam, 390 F.2d 879 (2nd Cir. 1969); Weber v. United States, 288 F.Supp. 491 (E.D. Pa.1968). But see Gion v. McNamara (C.D.Cal.1968).

---

32. Mellinger: "I was 40 minutes late." N.T. at 39.

33. John Zimmerman testified that his sideburns and hair were longer than Mellinger's, but he did not receive an unexcused absence. N.T. at 13–19. On the other hand, John A. Stoll, Jr. was cited for an unsatisfactory appearance along with Mellinger. N.T. at 29–30.

34. N.T. at 50.

35. Mellinger's counsel has pressed vigorously for admission of a transcript of the Article 138 hearing into evidence. We agree that it should be admitted. For some strange reason, the government has adamantly opposed its introduction even though it helps their position.

36. N.T. at 34 (Article 138 Hearing, April 24, 1970).

37. This result becomes even more palatable when one considers that Captain Snelbecker warned Mellinger in advance that his sideburns were too long, and that although Mellinger had both an opportunity as well as the resource to trim them, he did nothing. See notes 7–12 supra and accompanying text.

38. It is settled that enlistment in the military service establishes a contractual relationship. See e. g., Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961).

39. See e. g., Winters v. United States, 281 F.Supp. 389 (E.D.N.Y.1968), aff'd per curiam, 390 F.2d 879 (2nd Cir. 1969).

40. See e. g., Schwartz v. Franklin, 412 F. 2d 736 (9th Cir. 1969).

For purposes of this decision, therefore, we will accept Mellinger's assertion that his contract expressly limits his tour on active duty to 45 days upon unsatisfactory participation in the Ready Reserves. Such an assumption still leads to same result.

In those instances in which interpretation of the contract itself will not permit retroactive application of 10 U.S.C. § 673, the overwhelming majority of courts have nonetheless permitted imposition of a two year tour on two theories.[41] First, the courts have reasoned that under the so-called "War Powers," Congress can lawfully impair these enlistment contracts. See Heuchan v. Laird, 427 F.2d 980 (8th Cir. 1970); Schwartz v. Franklin, 412 F.2d 736 (9th Cir. 1969); Winters v. United States, 412 F.2d 140 (9th Cir. 1969); Karpinski v. Resor, 419 F.2d 531 (3rd Cir. 1969); Pfile v. Corcoran, 287 F.Supp. 554 (D.Colo.1968). However, this approach has recently come under thoughtful attack. At least one court has reasoned that since "Section 673 is more in the nature of a penalty than to fulfill the armed forces need for manpower . . . there is no vital need for [the] furtherance of any sovereign power, such as the War Power at issue." Harmonson v. United States, 2 S.S.L.R. 3151, 3152 (C.D.Calif.1969), overruled *sub silentio*, Schwartz v. Franklin, supra. Although this reasoning has great appeal, particularly in light of recent trends to cut back sharply on military manpower,[42] nevertheless, we need not decide the question since another method of analysis is suf-

ficient to support the retroactivity of Section 673.[43]

At the time that Mellinger signed his enlistment contract, the Army had a second consequence available for all delinquent reservists, regardless of the exact language of their contracts, in addition to activation for 45 days. Under 50 U.S.C. App. § 456(c) (2) (D),

"Any registrant enlisted * * * in the Ready Reserve of any reserve component of the Armed Forces * * who fails to serve satisfactorily during his obligated period of service as a member of such Ready Reserve * * member of such Ready Reserve * * * may be selected for training and service and inducted into the armed force of which such reserve component is a part, prior to the selection and induction of other persons liable therefor.

And upon *induction,* the former reservist would have to serve at least *two* years. Since by a different means Mellinger could have been made to serve two years anyway, retroactive application of 10 U.S.C. § 673 does not violate the Fifth Amendment. In short, because there are no changes in the substance of his contractual burdens by retroactive application of Section 673, no constitutional violation has occurred.[44] See Gianatasio v. Whyte, 426 F.2d 908 (2nd Cir. 1970); Raderman v. Kaine, 411 F.2d 1102 (2nd Cir. 1969); Winters v. United States, 412 F.2d 140 (9th Cir. 1969); Fox v. Brown, 402 F.2d 837 (2nd Cir. 1968); Schultz v. Clifford, 417 F.2d 775 (7th Cir. 1968), cert. denied, 397 U.S. 1007, 90 S.Ct. 1234, 25 L.Ed. 420; Weber v.

---

41. We have found only two decisions which forbid retroactive application of 10 U.S.C. § 673. See Harmonson v. United States, 2 S.C.L.R. 3151 (C.D.Calif.1969), and Gion v. McNamara (C.D.Calif.1969). But in our opinion both cases have been overruled sub silentio by the Ninth Circuit's opinion in Schwartz v. Franklin, supra, note 38. Those cases which allow retroactivity are mentioned in the text of this opinion.

42. See e. g., *New York Times*, February 2, 1971, page 1 (Secretary Of Defense

Laird announces cutback in draft calls for 1972).

43. In Harmonson v. United States, supra, the court never addressed this second point.

44. In fact, the burden upon activation would normally be *lesser* than for that incurred upon *induction* because Section 673 extends credit for time previously served on active duty. For this reason Mellinger has an obligation of only 15 months and 9 days, rather than 2 years.

United States, 288 F.Supp. 491 (E.D.Pa. 1968) ; Even v. Clifford, 287 F.Supp. 334 (S.D.Calif.1968) ; Pfile v. Corcoran, 287 F.Supp. 554 (D.Colo.1967).

### III.

■ We now turn to the viability of the statute itself. Mellinger asserts that Section 673 is constitutionally infirm because: (1) the term "unsatisfactory participation" lacks sufficient standards to withstand the void for vagueness test; (2) it authorizes administrative punishment without procedural due process; and (3) it subjects him to cruel and unusual punishment. He further requests that we convene a three-judge court under 28 U.S.C. § 2282 to hear these issues.

But before convening such a court, which places a particularly harsh strain on judicial resources, we must decide the threshhold question of whether Mellinger raises a substantial federal question requiring the attention of three judges. See generally, D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1 (1964).[45] Our research reveals that the identical three constitutional claims were raised by Mellinger's counsel before Judge Luongo in Mickey v. Barclay, 328 F. Supp. 1108 (E.D.Pa.1971). After careful consideration, Judge Luongo concluded that:

> "Plaintiff's attack upon the constitutionality of § 673a on its face is plainly insubstantial and does not warrant the convening of, a three-judge court under 28 U.S.C. § 2282. See Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965) ; Schneider v. Rusk, 372 U.S. 224, 83 S.Ct. 621, 9 L.Ed.2d 695 (1963) ; California Water Service Co. v. City of Redding, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323 (1937). I conclude that § 673a is constitutional on its face."

Although we have read all of the cases cited by Mellinger, it is our judgment that Judge Luongo reached the proper result in denying Mickey a three-judge court; and rather than merely repeating in this case what he has already so ably said, we will adopt his reasoning as our own. Consequently, for the reasons expressed in Mickey v. Barclay, supra, we reject Mellinger's three constitutional arguments as "plainly insubstantial," and refuse to convene a three-judge court.

In conclusion, Mellinger has not been deprived of any constitutional rights, nor has the Army violated its own regulations in any way that prejudiced him. Consequently, if the Army desires to reorder him to active duty, we will not interfere.[48]

45. In the leading case, Ex Parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933), the Supreme Court held that a single judge may dismiss a complaint challenging the constitutionality of a statute if the claim is "plainly insubstantial", either because it is "obviously without merit" or because it has been rejected by previous decisions.

48. The foregoing constitutes the court's Findings of Fact and Conclusions of Law as required by Rule 52(a) F.R.Civ.Pro.