UNITED STATES, Appellee,

v.

Rock HUDSON, Private, U. S.
Army, Appellant.

No. 33,855.
CM 434373.

U. S. Court of Military Appeals.

Oct. 10, 1978.

*Colonel Robert B. Clarke, Lieutenant Colonel John R. Thornock, Captain Ralph E. Sharpe,* and *Captain Michael B. Dinning* were on the pleadings for Appellant, Accused.

*Colonel Thomas H. Davis, Major John T. Sherwood, Jr.,* and *Captain Richard A. Kirby* were on the pleadings for Appellee, United States.

### Opinion of the Court

COOK, Judge.

The question before us is whether the accused was subject to court-martial trial. We conclude that he was.

### THE FACTS

Accused is a member of the California Army National Guard. As provided by statute[1] and regulation,[2] with his consent and that of the Governor of California, he was ordered to active duty at Fort Gordon, Georgia, for a period of "21 weeks or upon completion of MOS [Military Occupational Speciality] training but not less than 4 months." The 21–week period would have expired on August 7, 1975,[3] but successive extensions were ordered to enable the accused to continue training in a service school to qualify in his enlisted speciality. He succeeded, and was "graduated" from school on September 4.

Two days before graduation, the commanding officer of the company restricted the accused to the company area on a complaint by a fellow reservist, Willie Lovett, that the accused had forged his name to a bank withdrawal slip and had successfully obtained $200 from Lovett's account.

---

1. 10 U.S.C. § 672(d) (1970).

2. NGR 601–201 (1 May 1965).

3. The date noted is that referred to by the Court of Military Review and our own calcula-

tion. At trial and in accused's assignment of error before the Court of Military Review, August 6 and 8 were also mentioned by accused and his counsel.

On September 4, the general court-martial authority vacated the amendatory orders providing for accused's release date, and, in effect retained him on active duty indefinitely. A formal charge was sworn to on September 15th, and on the same day, accused was informed of the offenses charged.

At trial, defense counsel moved to dismiss the charges on the ground the accused was not subject to court-martial jurisdiction. He contended that the initial and amendatory orders were "self-executing"[4] so that on the last day of accused's scheduled release, September 9, he was automatically relieved from amenability to trial by court-martial for any misconduct committed during his active duty. Counsel acknowledged the rule that action initiated, with a view to trial of charges, before the effective date of release from active duty authorizes retention of an accused for completion of court-martial proceedings,[5] but he maintained the actions taken in respect to the accused in this case were insufficient to attach jurisdiction. The motion was denied. On review of accused's conviction by the Court of Military Review, and on this appeal, the argument has been expanded to include contentions that the initial order was improper because it did not provide for a specific period of time for active duty training, as required by paragraph 7a (9), AR 135–200, c. 4 (13 June 1967), and that the amendatory orders were improper, with the result that no action with a view to trial had been taken prior to accused's effective date of release from active duty.[6]

## VALIDITY OF THE INITIAL ORDER

■ Paragraph 7a (9), *supra*,[7] provides that "[o]rders will specify the length of ACDUTRA [active duty for training] . . expressed as a period of time (e. g., 12 days, 4 months). The period specified will not include travel time to or from the duty station." The accused contends that the initial order was fatally flawed because it lacked specificity as to the duration of active duty as mandated by the regulation.

As noted earlier, the order provided for service for a period of "21 weeks or upon completion of MOS training but not less than 4 months." We read it as setting forth the required training period as explicitly as permitted by the nature of the accused's commitment. The maximum period was 21 weeks; the minimum was 4 months. The accused could serve less than 21 weeks if he completed his required MOS training at an earlier date, but he could not serve more than that time, without an authorized extension of the period. Thus, while the actual time of service might be some time between 4 months and 21 weeks, it was determinable by an identifiable event essential to accused's required training and his MOS qualification, and, therefore, conformed to the prescription of the regulation that the period be for the required training time. We conclude, therefore, that the initial order comported with paragraph 7a (9).

## VALIDITY OF THE AMENDATORY ORDERS

Retention of a reservist on active duty beyond the date provided in an initial order of call was considered in *United States v. Peel*, 4 M.J. 28 (C.M.A.1977). We held that upon completion of training and "conferral" of the MOS, a reservist could not be retained on active duty "unless amending orders were sought from state authorities inasmuch as theirs was the sole constitutional and statutory authority to order a national guardsman to active duty." *Id.* at 29. As no evidence of explicit or implied consent by the state authorities to the reservist's

---

4. *United States v. Brown*, 12 U.S.C.M.A. 693, 31 C.M.R. 279 (1962); *United States v. Hamm*, 36 C.M.R. 656, 658 (A.B.R.1966), *petition denied* 16 U.S.C.M.A. 655 (1966). *See also United States v. Peel*, 4 M.J. 28 (C.M.A.1977).

5. Paragraph 11d, Manual for Courts-Martial, United States, 1969 (Revised edition).

6. *See United States v. Smith*, 4 M.J. 265 (C.M.A.1978); *United States v. Kalt*, 50 C.M.R. 95 (A.C.M.R.1975).

7. The regulation is made "applicable to the Army National Guard" by paragraph 2a, NGR 601–201, *supra*.

retention appeared in *Peel,* we set aside the accused's conviction of an offense committed after the prescribed date of release from active duty. This case is different.

■ Appellate defense counsel concede that accused's commitment to serve on active duty is determinable by "applicable laws and regulations" in effect at his enlistment. A National Guard regulation then in effect required, as a "condition of enlistment," that a person "without prior military service . . . enter on active duty for training in a Federal status." Paragraph 2–12, NGR 600–200 (30 March 1973). The accused belonged in this category. The minimum period of training was 4 months; the maximum depended upon the time required for qualification in a MOS. Before the applicant took the enlistment oath, he had to be instructed as to his service requirements. In material part, he was to be informed that if he did not "complete [his] training during the period for which . . initially ordered to active duty for training" he "must agree to:

    a. Remain on active duty for training for such additional period as is required to complete your training, or,

    b. Accept training in an alternate military occupational speciality if offered and remain on active duty for such additional period as is required to complete such training."

NGB Form 21b (1 Sep 1973). The regulation further required that an executed writing, titled "Acknowledgment of Understanding of Service Requirements," which sets out the instructions, be attached to the enlistment record. *Id.*, para. 2–12. A photocopy of what trial counsel described as the "original" enlistment contract was admitted into evidence, but the Acknowledgment is not with it. However, in his testimony on the motion to dismiss, the accused acknowledged he had been advised, at his enlistment, that he had to "complete . . basic and . . . MOS training" before he could return to his reserve unit and be "considered as a civilian."

■ Considering the enlistment procedure and the evidence at trial, it may fairly be concluded that the accused and the state authorities anticipated that the time specified in the original order to active duty might not be enough to enable the reservist to complete his training for MOS qualification, and, therefore, they agreed, as part of the enlistment contract, to accept such extensions of time for that purpose as might be deemed necessary by the Army. The anticipation and the agreement are implicit in a provision in the initial order to the effect that the period of active duty could be "extended by proper authority." Nevertheless, appellate defense counsel maintain that the Army could not extend accused's training for MOS qualification, without first obtaining his written consent.

Paragraph 14a, AR 135–200, c. 2 (25 June 1965), refers to extensions of tours of active duty for training. In material part, it provides that trainees enrolled in a service school to obtain proficiency in a technical MOS "may, if the period of ACDUTRA remaining in the ACDUTRA tour is insufficient for completion of the training, have their tours extended in accordance with AR 612–200 [now AR 612–201 (30 June 1972)]." A trainee "must agree in writing to the extension by executing [an] indorsement to the enlistment agreement," in the form specified in the regulation. Paragraph 14a, AR 135–200 (11 Sep 1964). No indorsement executed by the accused appears in the record.

■ Accused's counsel contend that an executed form is "absolutely required"; without it, the accused's active duty commitment ended on the date of expiration of active duty provided in the initial order. Their argument does not take account of apparent differences of treatment in the regulation of trainees enlisted under the Reserve Enlistment Program of 1963, P.L. 88–110, 88th Cong., and without previous service, as this accused, and trainees on active duty for training as a result of other commitments. We shall consider this circumstance in more detail later. Suffice it here to note that, assuming this part of the regulation applied to accused, his enlistment contract required him to qualify for a

specified MOS and obligated him to "agree" to remain on active duty for training "for such additional period as is required to complete" his training. As applied to the accused, therefore, the provision that the trainee submit his written consent to an extension of time for training to qualify for his MOS added nothing to his legal obligation to remain on active duty for that purpose and to his previous consent to such extensions of time as might be deemed appropriate by the Army. The requirement of a written consent, therefore, appears not as a necessary condition to retention in the service to complete the MOS qualification, but merely as an administrative measure to obtain recordable evidence of accused's awareness of the particular additional period of active duty for training.[8] We conclude, therefore, that the absence of accused's written consent, if in fact required by paragraph 14a of AR 135–200, did not invalidate the amendatory orders.

In a second challenge to the validity of the amendatory orders, appellate defense counsel contend that limitations on extensions of training imposed by paragraph 3–23, AR 612–201 (19 Aug 1974), precluded training beyond August 22, 1975, which was prior to any action that could operate to attach jurisdiction over his person. The cited paragraph is captioned, "Disposition of personnel who are unable to complete advanced individual training." Subdivision *a* of the paragraph provides for "[a]*cademic recycling*" of a trainee taking a course of more than eight weeks duration, and limits such recycling "to not more than two . . . of 2 weeks each, only one of which may be

permitted in the last 6 weeks of the course." Counsel note that qualification for the accused's MOS required 11 weeks of training and, therefore, he came within this provision. Counting backward from accused's graduation from school on September 4, they argue that, as both amendatory orders were issued within the last six weeks of school, neither order could extend the period of active duty for more than two weeks. As we construe the provision, however, it does not apply to trainees like the accused.

The regulation governs processing procedures at Army reception stations and training centers. Several classes of persons come under its provisions. One class is that to which the accused belongs, i. e., persons without prior service who entered active duty under the Reserve Enlistment Program of 1963, designated in the regulation as "REP 63 initial ADT personnel"; another consists of enlisted persons "who transit" Examining and Entrance Stations and elements of the U.S. Army Recruiting Command. *Id.*, para. 1–1. Under the regulation, REP 63 personnel cannot

> be released to their parent unit without having . . . fulfilled their ADT [active duty for training] commitment as specified by the enlistment contract unless they have been recommended for discharge. . . . Fulfillment of [that] commitment occurs when the individual is qualified for the MOS for which he enlisted.

*Id.*, para. 1–4*i*. This requirement is again stressed in paragraph 3–23. Subdivision *c* provides as follows:

> can seriously impair the state's control over, and responsibility, for the reserve force. Considering § 672(d) in context of the reserve program, consent of state authorities is required not just for the initial order but for retention, *absent circumstances that otherwise authorize* extension of active duty beyond the period prescribed, *e. g.*, to make up time lost by unauthorized absence as provided by 10 U.S.C. § 972 and paragraph 2–3*c*, AR 635–200 (June 1966). *Cf.* 10 U.S.C. § 3262; paragraph 15, AR 135–200, c. 2 (25 June 1965) (medical care for line of duty injury as not extending period of active duty for training). Retention beyond the initial period for the purpose of qualification in enlisted MOS is discussed later in the text.

8. We reach this result despite a difference in language in 10 U.S.C. § 672(d) regarding the consent required for an order to active duty and that required for retention on active duty. The statute provides that a proper authority *may order the reservist "to active duty, or* retain him on active duty with . . . [his] consent."* Regarding the consent of the state authorities, the statute provides only that a reservist "may not be ordered to active duty . . . without the consent of the governor or other appropriate authority of the State"; no reference is made to consent to retain the reservist beyond the time provided in the order of call. Extension of a reservist's period of active duty beyond that agreed to by the state

(1) REP 63 initial ADT personnel will be MOS qualified before being released to the ARNGUS or USAR. See paragraph 3–29*c*.

Paragraph 3–29*c* is captioned "*Extensions for REP 63 initial ADT personnel.*" In material part, it provides as follows:

(1) *Commander's evaluation.* Commanders will continually evaluate the individual's progress and recycle him when appropriate. An individual may be recycled one or more weeks for additional training. In such instance, care will be taken to insure that the individual will complete the course during ADT. If the course cannot be completed during this period, the individual will be retained to complete the course in accordance with his training agreement. The training activity commander will issue amendatory orders extending the individual's period of ADT for the period required to complete the course of training. . . . If for any reason the individual cannot satisfactorily complete the required training in the MOS for which he originally entered on active duty for training, he will be required to train for the purpose of qualifying in an alternate MOS in accordance with his training agreement. Request for training in an alternate MOS will be referred to the appropriate State adjutant general, in case of ARNGUS personnel . . . for determination of the alternate MOS for which training is desired.

■ Considering the separate and detailed treatment of the class of trainees to which the accused belongs, we conclude that he was not within the provisions of subdivision *a*, as contended by appellate defense counsel, but within subdivision *c*. Nothing in the latter subdivision limits the number of extensions that may be granted, or the time within which they can be granted. On the contrary, the general command is that persons within that class "will be kept at the training activity unless they are considered untrainable." *Id.*, para. 3–23c(2). The orders extending the accused's term of active duty were, therefore, in conformity with this aspect of the regulation.[9]

## ACTION TO ATTACH JURISDICTION

■ The second of the amendatory orders extended accused's release date to September 9. Both of the orders were revoked on September 4. The intent of the revocation order is not clear. In view of the limited purpose for which the accused was on active duty, it could not, after attainment of his MOS, retain him indefinitely on active duty, without his consent and the "authorization" of the state reserve authority. *United States v. Peel, supra* at 29.

At trial, government counsel argued that the revocation order, which was apparently promulgated in response to a formal request by accused's commanding officer to retain him "pending completion of the investigation" of the charges against him, constituted approval by the GCM authority to preserve jurisdiction previously attached, as provided by paragraph 2–4, AR 635–200 (July 1966).[10] Accordingly, we assume for

---

9. Our disposition of this aspect of the accused's challenge of the validity of the amendatory orders makes it unnecessary to consider whether accused's unprotested continuance with training and the acceptance of pay and allowances in September and October constitute a waiver of compliance with the regulation. *See United States v. Kilbreth*, 22 U.S.C.M.A. 390, 47 C.M.R. 327 (1973).

10. The paragraph of the regulation reads as follows:
2–4. When investigation *is* initiated with view to trial by court-martial or member is awaiting trial or result of trial. *a.* A member may be retained beyond the expiration of his term of service by a general court-martial convening authority, or his designee, when an investigation of his conduct has been initiated with a view to trial by court-martial; charges have been preferred; or the member has been apprehended, arrested, confined or otherwise restricted by the appropriate military authority. However, if charges have not been preferred, the member shall not be retained more than 30 days beyond the expiration of his terms of service without the personal approval of the general court-martial convening authority concerned.
*b.* An individual who, on the date on which he would otherwise be eligible for discharge or release from active duty, is awaiting trial or result of trial by court-martial will not be discharged or released from active

the purpose of this appeal that the revocation order had no effect on the earlier extensions of the period of training, with the result that the effective date of release continued to be September 9. The remaining question is whether sufficient action had been taken previous to that date to attach jurisdiction for the purpose of continuing the proceedings against accused.

Military status does not ordinarily terminate automatically at the instant of expiration of a period of prescribed active duty. *United States v. Hutchins*, 4 M.J. 190 (C.M.A.1978). A "self-executing" order, however, effects a change of status at the exact time provided in the order. *United States v. Smith*, 4 M.J. 265, 266 (C.M.A. 1978). But, even such an order does not free the individual from military jurisdiction, if before the prescribed time, action on a court-martial charge against him has been taken with a view to trial. Paragraph 11*d*, Manual for Courts-Martial, United States, 1969 (Revised edition), lists "apprehension, arrest, confinement, or filing of charges" as sufficient evidence of "commencement of action with a view to trial" to allow continuation of military jurisdiction over the individual. The list is illustrative, not exclusive.

In *United States v. Smith, supra,* two general definitions were propounded by which to assess the sufficiency of action to satisfy the requisites for continuing jurisdiction. The principal opinion noted that the action must be *"official"* and of a nature that "authoritatively signaled . . [the sovereign's] intent to impose its legal processes upon the individual." *Id.* at 267. The separate concurring opinion posited that the action must be of a kind to provide the accused with "sufficient notice to give rise to legal remedy in the event of a wrong committed in the process of justice." *Id.*

The testimony of the accused and that of his commanding officer indicate that in late August, Willie Lovett, a fellow trainee and friend of the accused, "signed a statement saying" that the accused had taken $200 from Lovett's account in the Georgia Railroad Bank and Trust Company by forging a withdrawal slip in Lovett's name. On August 29, at the company orderly room, a bank investigator interviewed the accused. The representative showed the accused "a bank withdrawal thing" and obtained from him samples of his handwriting. On September 2, CID agents questioned the accused at their office; when they returned him to the company, they "formally charg[ed] him with these two violations." Captain Seacord, the company commander, brought the accused into his office. He also informed him of Lovett's complaint and "restricted him to the company." A writing entitled, "Limits of Restriction" was signed by Captain Seacord and given to the accused; at the foot of the statement, the accused certified that he understood those limits.

The restriction document defined the company area. It authorized the accused to attend service at Chapel 10 on the post, provided he signed out on leaving and in on returning, with the Charge of Quarters. The accused was also required to sign in and out with the Charge of Quarters during non-duty hours and on weekends; the Charge of Quarters was required to make periodic bedchecks of the accused during the night. The accused was allowed to attend school without escort "because . . [he] |went with the other students," but when he went to mess, he was "escorted back and forth."

Captain Seacord also informed the accused that if "the handwriting analysis came out positive," the charges would "probably" be referred to a GCM, and advised him "to get an attorney." When the accused asked about "get[ting] a discharge

duty until final disposition of the court-martial charges. For effective date of discharge, see section V, this chapter. Enlisted personnel under sentence to dishonorable or bad conduct discharge will not be discharged prior to completion of appellate review, unless so directed by Headquarters, Department of the Army. If the individual is absent without leave at the time appellate review is completed, the punitive discharge may be executed notwithstanding his absence.

so I can go home," he was told he could not "go anywhere until . . . [Lovett's] case was resolved."

█ The accused was not placed in confinement or under apprehension, but the restraints imposed upon his freedom of movement were unquestionably severe. We entertain no doubt that the Government had "authoratively" imposed "its legal processes upon" him and the he had "sufficient notice" of commencement of legal actions calculated to insure his presence for probable trial by court-martial on the charges lodged by Lovett. We conclude that the actions taken attached jurisdiction over him before the date of his scheduled return to non-active duty status, and sustained continuation of the court-martial proceedings after that date.

The decision of the United States Army Court of Military Review is affirmed.

Judge PERRY concurs.

FLETCHER, Chief Judge (concurring in the result):

I concur in the result. My reading of the appellant's orders and service regulations applicable to this National Guardsman differs from that expressed in the lead opinion. Nonetheless, I also vote to affirm the decision of the United States Army Court of Military Review.

Pursuant to 10 U.S.C. § 672(d), as implemented by Army and National Guard Regulations, with his own consent and that of the Governor of California, the appellant was ordered to active duty under the terms of his orders, for a period of "21 weeks or upon completion of MOS [Military Occupational Specialty] training but not less than 4 months." Reporting for duty on March 14, 1975, his 21 weeks of training would have expired on August 7, 1975 at midnight. However, as the time drew nigh for examination and successful completion of his course, appellant was unprepared, resulting in successive rescheduling of the final test

for August 26, then August 29, and finally September 4, when he suitably completed the examination and was graduated.

According to the appellant's testimony, he was originally scheduled to graduate from MOS training on August 6, 1975; but due to his failure to keep pace with the rest of his class, he was unable to graduate on that date. Continued failure on his part to meet the requisites for his MOS training necessitated the successive scheduling of the examination and graduation dates mentioned above. Although the language of his original orders was self-executing on the completion of his MOS training, and apparently in contemplation of his successful completion of his training, Special Order No. 168 was issued on August 28, 1975, which provided for *his relief from active duty* for training effective as of 2400 hours on September 2, 1975. On September 2, 1975, Special Order No. 170 was issued as an amendment to Special Order No. 168. The new order changed the appellant's *effective relief from active duty training date* to September 9, 1975. On September 4, 1975, a third Special Order, No. 172 was issued which revoked the prior two special orders. As stated earlier, the appellant completed his MOS training and graduated on September 4, 1975.

On July 10, 1975, the appellant committed the offenses of which he presently stands convicted. Prior to his belated graduation the appellant became a criminal suspect. After his apprehension and interview by the Criminal Investigation Division (CID) on September 2, 1975, his commanding officer notified him that he was being charged, advised him of rights under Article 31, 10 U.S.C. § 831, and placed appellant on restriction in lieu of arrest, the terms of which appellant acknowledged in writing. On September 4, the general court-martial convening authority, in response to the request of the commanding officer, ordered retention of appellant due to the on-going investigation.[1] It is his amenability to trial

1. The general court-martial convening authority, as authorized under the provisions of Chapter 2, Section II, paragraphs 2–4a and b, AR 635–200, c. 43 (10 April 1974), held appellant past his expiration of term of service until disposition of the investigation and charges.

by court-martial for these July offenses that the appellant now contests on three separate but related grounds.

The initial contention of the appellant is that the failure of court-martial jurisdiction to attach, prior to his purported change to inactive duty status on August 8, 1975, eviscerated the authority of the Army to try him for offenses allegedly committed by him in July while on active duty. Paragraph 11d, Manual for Courts-Martial, United States, 1969 (Revised edition). More particularly he asserts that his initial orders for active duty for training require automatic expiration of his active duty status after 21 weeks, regardless of his completion of his MOS training, unless he is extended by proper authority. *See United States v. Peel*, 4 M.J. 28 (C.M.A.1977). He then contends that the Army failed to extend him by proper authority since no lawful action was taken prior to August 8, 1975, to extend him on active duty. Moreover, he claims that the orders later issued were defective on account of the Army's failure to obtain his consent to an extension of active duty in accordance with service regulations.[2] Accordingly, he concludes that the total absence of action with a view towards trial in accordance with paragraph 11d, Manual, *supra*, while he was lawfully on active duty renders him immune from prosecution at court-martial for these offenses.

Despite the resourcefulness of the appellant's initial argument, I am not persuaded by its logic or its foundations in fact. It is beyond cavil that a member of the National Guard is subject to court-martial jurisdiction for the period of time he is in an active duty status. *See* 10 U.S.C. § 3499. In the present case, the appellant's initial orders, issued with his consent and that of the Governor of California, placed him in this active duty status until his completion of his MOS training.[3] As contended by the appellant, these orders on their face are self-executing. *See United States v. Peel, supra.* Nevertheless, the date of expiration in my mind is September 4, 1975, the day he completed his MOS training and graduated from the training school. I construe the special orders issued in this case to merely articulate a release date for the appellant consistent with his previously fixed period of obligated active duty training. It seems to me most unreasonable to view them as extensions of the appellant's active duty in light of the language of the orders themselves. Moreover, this seems especially unreasonable where the appellant has not completed the MOS training required in his original order and there is no indication that the orders were issued to retain the appellant after completion of his prescribed training. In any event, these orders were themselves revoked on September 4, 1975, and, accordingly, should be considered without effect in the present case.

The pertinent factor for consideration is the original set of orders of the appellant calling him to active duty for training. Two questions arise from the facts in this case. Did the Army commence action with a view to trial prior to September 4, 1975? Was the appellant extended by proper authority on September 4, 1975 and lawful action taken to bring him to trial within this period of extension? I believe both questions may be answered in the affirmative and either one is sufficient to sustain jurisdiction in the present case.[4]

---

2. Paragraph 14a, AR 135–200, c. 2 (25 June 1965).

3. The appellant's supplemental attack on these initial orders as invalid on account of a purported lack of regulatory specificity is found without merit later in this opinion.

4. Once court-martial jurisdiction attaches it continues regardless of later change in status. *Carter v. McClaughry*, 183 U.S. 365, 383, 22 S.Ct. 181, 46 L.Ed. 236 (1902); *Lee v. Madigan*, 358 U.S. 228, 231, 79 S.Ct. 276, 3 L.Ed.2d 260 (1959); *Barrett v. Hopkins*, 7 F. 312, 315–16 (D.Kans.1881). *See* paragraph 11d, Manual for Courts-Martial, United States, 1969 (Revised edition). So a conviction over Lt. Calley (who committed offenses prior to his release date but was tried after) was sustained. *United States v. Calley*, 46 C.M.R. 1131, 1141–42 (A.C.M.R. 1973), *affirmed*, 22 U.S.C.M.A. 534, 48 C.M.R. 19 (1973), sustained *sub nom. Calley v. Callaway*, 519 F.2d 184, 227 (5th Cir., 1975) (en banc), *cert. denied sub nom. Calley v. Hoffman*,

The appellant acknowledged that he was placed on restriction in lieu of arrest on September 2, 1975, for these July offenses. This was two days before the completion of his MOS training and graduation, the events which trigger the execution of his orders and the expiration of his active duty status. Paragraph 11*d*, Manual, *supra*, specifies certain actions which qualify as "commencement of action": apprehension, arrest, confinement and filing of charges. I believe restriction under these circumstances was a sufficient action under this Manual provision to effect continuing jurisdiction over the appellant.[5]

Moreover, the appellant's record was flagged on September 2, 1975, and on September 4, 1975, the general court-martial convening authority retained appellant past his term of service in accordance with the provisions of Army Regulations.[6] There is no indication in the record of trial that the appellant had completed his MOS training and graduated prior to his official retention or indeed that he would not be required to remain in an active duty status until 2400 on this date. In any event, in this case I find the appellant was still in active Federal service on this date and subject to the retention regulation by reason of his original enlistment contract, his active duty for training orders and 10 U.S.C. § 3499. Accordingly, the appellant was properly retained on active duty, and filing of charges on or about September 18, 1975, preserved jurisdiction within the meaning of paragraph 11*d*, Manual, *supra*.

In view of these considerations, I am constrained to find the initial jurisdictional attack of the appellant without merit.

Reduced to its essence, the remainder of appellant's argument is that under the provisions of paragraph 7*a* (9), AR 135–200, c. 4 (13 June 1967),[7] appellant's active duty orders fail adequately to express a period of time as required by the regulation and, accordingly, are invalid. Second, he contends that the Army failed to comply with a different regulation[8] by not obtaining his written consent to extend his active duty tour in order to complete his training.

Like the court below, I am unable to agree with these assertions. A National Guardsman is, in the truest sense of the term, a citizen-soldier—fundamentally a citizen serving a military commitment with his sovereign under contract. As such, he is amenable to trial by court-martial during his active federal duty. Article 2(1), Uniform Code of Military Justice, 10 U.S.C. § 802(1); *In re Taylor*, 160 F.Supp. 932 (W.D.Mo.1958). The terms of his agreement with his sovereign delineate and are dispositive of the court-martial jurisdiction. *Mellinger v. Laird*, 339 F.Supp. 434 (E.D.Pa.1972); *Morse v. Boswell*, 289 F.Supp. 812 (D.Md.1968), *aff'd* 401 F.2d 544 (4th Cir. 1968), *cert. denied* 393 U.S. 1052, 89 S.Ct. 687, 21 L.Ed.2d 694 (1969).

A fair application of the facts of this case to the Army regulations purportedly pro-

---

425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976).

5. For a further exposition of my views on this definitional concept, *see* my concurrence in the result in *United States v. Smith*, 4 M.J. 265 (C.M.A.1978).

6. *See* footnote 1.

7. Paragraph 7*a* (9), AR 135–200, c. 4 (13 June 1967) states:

7. Orders. *a.* Preparation. Applicable to USAR only. (Instructions in NGR 25–5 apply to ARNG personnel).

. . .

(9) Orders will specify the length of ACDUTRA or ANACDUTRA expressed as a period of time (e. g., 12 days, 4 months).

The period specified will not include travel time to or from the duty station. Travel time is determined by the personnel officer at the station of attachment in accordance with paragraph 11.

Even considering paragraph 2*a*, NGR 601–201 (1 May 1965), as indicated in footnote 7 of the lead opinion, I have doubts with respect to the applicability of this regulatory provision of AR 135–200 to orders for a National Guardsman. In any event, for the purpose of this review I will assume such provision is applicable.

8. Paragraph 14*a*. AR 135–200, c. 2 (25 June 1965).

viding for the active duty training of a National Guardsman does not show a contravention of the applicable regulations. Appellant's orders calling for an activation during "21 weeks or until completion of MOS training" fulfill the requirement of "a period of time" as required by this regulation. In addition, the disjunctive form of the period of time specified in the orders does not detract from the proper view of the contractual position of the National Guardsman: his active duty calls for successful completion of his training. Paragraphs 2*b* and 5, NGR 601–201(1 May 1965). Under 10 U.S.C. § 672(d), this appellant consensually entered active duty with lawful orders asseverating his duty to qualify as proficient in a technical specialty or MOS.

Had he exhibited his proficiency by passing the examination prior to the termination of 21 weeks and after 4 months, thus fulfilling his contractual obligation to successfully complete training, he arguably might have been discharged from active duty early. But he did not; indeed, exigencies required additional training in order to be prepared. And so the disjunctive language of his orders allowed proper completion of his training.

Appellant further argues that the Army's failure to obtain, under the terms of its own regulation, appellant's written consent for retention on active duty[9] is fatal to its cause. Contrariwise, the Government asserts that as the express terms of appellant's activation orders called for active duty "until completion of MOS training," it was, therefore, unnecessary to obtain further consent inasmuch as the appellant had already given such consent upon his enlistment and call to active duty. *See* 10 U.S.C. § 511(a). As has been shown, with the effect of the government's reasoning I agree, for the jurisdictional grant of authority had been given by Congress in 10 U.S.C. 672(d) and Article 2 of the Code. While the Army is obligated to follow its regulations, it cannot be said that this administrative oversight disengaged the appellant from the vested jurisdiction; rather, he continued in a status previously agreed upon: that of a citizen-soldier subject to court-martial jurisdiction. Moreover, as previously stated in this opinion, there is no question of extension of orders where the special orders merely attempted to specify a release date in conjunction with a fixed period stated in the original orders. Finally, these special orders had no legal effect because of their cancellation, and, accordingly, they are irrelevant to our disposition of this case. The third contention of the appellant is also without merit.

I, thus, concur in the result.

---

**9.** Paragraph 14*a*, AR 135–200, c. 2 (25 June 1965):

14. *Extension of ACDUTRA tours. a.* Initial trainees who cannot complete the training cycle because of sickness, not due to misconduct, or who are enrolled in a service school for the purpose of attaining proficiency in a technical MOS for which potentially qualified, may, if the period of ACDUTRA remaining in the ACDUTRA tour is insufficient for completion of the training have their tours extended in accordance with AR 612–200. [Superceded by 612–201]. The member must agree in writing to the extension.