UNITED STATES, Appellee,

v.

Jerry R. SELF, Jr., Private, United States Army, Appellant.

No. 37,995.
CM No. 437467/G.

U. S. Court of Military Appeals.

June 14, 1982.

For Appellant: *Captain Edward J. Walinsky* (argued); *Colonel Edward S. Adamkewicz, Jr., Captain H. Franklin Young, III, Captain Alan W. Schon, Captain Kevin E. O'Brien* (on brief); *Lieutenant Colonel John F. Lymburner, Captain John Lukjanowicz.*

For Appellee: *Captain Rexford T. Bragaw, III* (argued); *Colonel R. R. Boller, Captain Stephen D. Smith* (on brief); *Major David McNeill, Jr., Major Ted B. Borek.*

*Opinion of the Court*

EVERETT, Chief Judge:

Notwithstanding appellant's pleas, a general court-martial composed of a military judge sitting alone convicted him of having willfully and maliciously burned an automobile with intent to defraud the insurer and of having falsely sworn, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge. The convening authority approved the trial results and the United States Army Court of Military Review affirmed. *United States v. Self*, 8 M.J. 519 (A.C.M.R.1979).

At trial, appellant moved for the military judge to dismiss the charges against him on the ground that the court-martial did not possess personal jurisdiction over him. In essence, he contended that his term of service on active duty as a national guardsman had expired without Army officials having sought and obtained State permission to retain him on active duty and without Army officials having taken definitive action against him with a view toward prosecution. The motion was denied. Appellant renewed this claim before us and we granted further review of it. 8 M.J. 136.

I

The evidence shows that appellant was a North Carolina National Guardsman who, with the consent of the State's Governor, was ordered to active duty for training on July 1, 1977 for a period of "24 weeks or upon completion of MOS training, but not less than 12 weeks." The orders also provided that appellant's active duty could be "extended by proper authority." However, absent such extension, as the parties stipulated at trial, the "end of [appellant's] term of service pursuant to his orders" was to be November 18, 1977.

On November 1, 1977, at Fort Belvoir, Virginia, appellant's duty station, his car had been drenched with gasoline and burned. Two days later, as the purported "victim" of the crime, Self was interviewed by Special Agent Brown of the Criminal Investigation Division (CID). During this interview he executed an affidavit attesting that he did not know who burned his car. However, "[b]etween about the 11th through the 14th of November of 77," ap-

pellant was "targeted as a potential suspect by CID."

It was during this same period that a Private Rausch, who had been questioned as a suspect, began to assist the CID in its investigation so that he could "get them off my back." Apparently Rausch had encountered appellant at a bus stop and had mentioned the incident of the burned automobile. After Self had identified himself as the owner of that car, he made some incriminating admissions. At a subsequent meeting with Self, Rausch had pretended that he also wished to burn his own car in order to defraud the insurer. Appellant then remarked that he had done this and he acknowledged that the scheme which Rausch proposed to use in burning his own car conformed to appellant's modus operandi. Since Rausch had reported this conversation to the CID by November 14, 1977, appellant by then had moved to the top of the suspect list.

On November 16, the CID called the appellant in as a suspect. During the ensuing interview he was warned of his rights and executed the standard DA Form 3881—the Rights Warning Procedure/Waiver Certificate. At the next morning's formation, appellant appeared "worried and anxious" and told Rausch, among other things, that he "expected to go to jail for six months."

On November 18, 1977, the effective date for termination of his active duty under his self-executing orders[1], appellant was "flagged" pursuant to Army Regulation 635–200, which provides in paragraph 2–4a :

> A member may be retained beyond the expiration of his term of service when an investigation of his conduct has been initiated with a view to trial by court-martial; charges have been preferred; or the member has been apprehended, arrested, confined or otherwise restricted by the appropriate military authority. However, if charges have not been preferred, the member shall not be retained more than 30 days beyond the expiration of his term of service without the personal approval of the general court-martial convening authority concerned.

Then after we announced on November 28, 1977, our decision in *United States v. Peel*, 4 M.J. 28 (C.M.A.1977), authorities at Fort Belvoir contacted the North Carolina National Guard on December 8, 1977, and received verbal authorization to retain him on active duty for purposes of prosecution. On February 15, 1978, the Adjutant General of the North Carolina National Guard notified the Army that amending orders would be forthcoming and that the Army could proceed with prosecuting Self. On February 16, 1978 charges were preferred, and on February 27, 1978, the National Guard published amending orders which purported to extend appellant's term of service "from completion of MOS training until court-martial proceeding and/or punitive proceedings are completed."

## II

Clearly the Army may exercise court-martial jurisdiction over an Army National Guardsman while he is on active duty. *See* 10 U.S. § 3499. However, once that active duty is over, such jurisdiction is lost. *See United States v. Brown*, 12 U.S.C. M.A. 693, 695, 31 C.M.R. 279, 281 (1962). Appellant's active duty was scheduled to end on November 18, 1977, according to the terms of the self-executing orders that he received before he went on active duty.[2]

---

1. We have defined "[s]uch orders" as those which "by their own terms automatically become effective on the specified effective date without any further action being required." *United States v. Smith*, 4 M.J. 265, 266 n. 3 (C.M.A.1978).

2. There is some question whether the orders automatically terminating appellant's active duty status on November 18, 1977, were effective at 12:01 a. m. on that date or at midnight at the end of that date. In *United States v. Smith, supra* at 266, we noted that the Court of Military Review had assumed that the precise effective time of self-executing termination orders was 12:01 a. m. on the date specified. *Cf. United States v. Brown*, 12 U.S.C.M.A. 693, 694–95, 31 C.M.R. 279, 280–81 (1962), where we held orders relieving the accused from active duty were effective the moment they were delivered to him, in spite of service regulations then in effect which purported to delay the

■■ A unanimous court has recognized that, if appropriate State authorities consent,[3] a national guardsman may be retained on active duty beyond the date prescribed by his orders to active duty. *See United States v. Peel, supra.* Moreover, retention on active duty is not authorized *without* consent "from state authorities inasmuch as theirs was the sole constitutional and statutory authority to order a national guardsman to active duty". *Id.* at 29. *Accord, United States v. Hudson*, 5 M.J. 413, 417–18 (C.M.A.1978). Typically, such consent is reflected by the publication of "amending orders"—as finally was attempted in the case at bar. However, since here these orders and the earlier verbal authorization from the North Carolina National Guard both postdated the end of appellant's prescribed tour of duty, they could not revive military jurisdiction if it had already been lost. Important constitutional rights cannot be altered by purported action *nunc pro tunc.*

In addition to express consent to extension of a national guardsman's tour of active duty, we also have recognized another means by which a valid extension can take place. Thus, in *United States v. Hudson, supra* at 417 n.8 (emphasis added), we wrote:

> Considering [10 U.S.C.] § 672(d) in context of the reserve program, consent of state authorities is required not just for the initial order but for retention, *absent circumstances that otherwise authorize*

extension of active duty beyond the period prescribed, e.g., to make up time lost by unauthorized absence as provided by 10 U.S.C. § 972 and paragraph 2–3c, AR 635–200 (June 1966). *Cf.* 10 U.S.C. § 3262; paragraph 15, AR 135–200, c.2 (25 June 1965) (medical care for line of duty injury as not extending period of active duty for training).

Our recognition of an extension of active duty under such circumstances is faithful to the constitutional powers of each State with respect to the National Guard, for, when a State consents to the calling of a guardsman to active duty, it must be deemed to have consented to his retention on active duty pursuant to statutes and regulations of general applicability that are in effect at the time.[4] For example, when a guardsman is absent without authority during a tour of active duty, by statute the days lost are added to the tour of duty to be performed, and the State's consent is considered to include these extra days. *United States v. Hudson, supra.* Likewise, the State's consent to the initial call of the guardsman to active duty must be viewed as including any extension of military jurisdiction prescribed by the Manual for Courts-Martial— which is promulgated by Presidential Executive Order pursuant to the congressional authorization in Article 36 of the Uniform Code, 10 U.S.C. 836, or retention on active duty pursuant to Army Regulations.[5]

Army Regulation 635–200, which concerns "Personnel Separations," contains in

---

effectiveness of such orders until 2400 hours on the date specified. Current Army regulations provide that when an enlisted person is relieved from active duty to revert to the control of a State's National Guard, orders doing so are effective at 2400 hours on the release date. Para. 2–13*b*(2), AR 635–200 (December 5, 1972).

**3.** Authority to order a State's national guardsman to active duty lies with the State's Governor, 10 U.S.C. § 672(d), or its adjutant general, para. 6 of AR 135–200 (September 11, 1964), and para. 4b of NGR 601–201 (May 1, 1965). The same officials may consent to retention. *See United States v. Peel*, 4 M.J. 28 (C.M.A. 1977).

**4.** The reference in appellant's orders to "extended by proper authority" includes exten-

sions by the Army pursuant to existing statutes and regulations. Perhaps the State may even be viewed as giving implied consent to regulations of general applicability or statutes that postdate the commencement of a tour of active duty served by the National Guardsman but before its scheduled terminal date. However, we need not confront that issue in the case at bar.

**5.** Such regulations, when properly promulgated, have the force of law. *See Billings v. Truesdell*, 321 U.S. 542, 551, 64 S.Ct. 737, 743, 88 L.Ed. 917 (1944); *Standard Oil Co. v. Johnson*, 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942); *United States v. Whiting*, 12 M.J. 253, 256 n.3 (C.M.A.1982).

Chapter II a section entitled "Discharge, Release from Active Duty, or Release from Active Duty for Training after Expiration of Period of Active Duty or Active Duty for Training." Included in this section is paragraph 2–4, which is headed, "When investigation is initiated with view to trial by court-martial or member is awaiting trial or result of trial"; and, in retaining appellant on active duty, the Army relied on the language therefrom which was quoted earlier in this opinion.[6] This wording resembles, but varies slightly from, that of paragraph 11d of the Manual for Courts-Martial, United States, 1969 (Revised edition), which states:

> Jurisdiction having attached by commencement of action with a view to trial—as by apprehension, arrest, confinement, or filing of charges—continues for all purposes of trial, sentence, and punishment. If action is initiated with a view to trial because of an offense committed by an individual before his official discharge—even though the term of enlistment may have expired—he may be retained in the service for trial to be held after his period of service would otherwise had expired.

6. Appellate government counsel have also directed our attention to Army Regulation 600–31, which concerns "Suspension of Favorable Personnel Actions for Military Personnel in National Security Cases and Other Investigations or Proceedings." Included in such actions is "[r]elease from active duty," para. 1h; and suspension of favorable personnel action is directed for personnel "[a]gainst whom an investigation is initiated by military or civilian authorities concerning credible allegations or incidents which reflect unfavorably upon their character or integrity." See para. 3a(3). It might seem that the "[r]elease from active duty" with which this regulation is concerned is one that would take place before the normal termination date of a tour of active duty and that an involuntary extension of a soldier's tour of duty would not fall within the purview of this directive. However, we note that on November 18, 1977, military authorities used DA Form 268, dated May 1, 1974, entitled "Report for Suspension of Favorable Personnel Actions," in "flagging" appellant's separation; and apparently this was contemplated by paragraph 7 of AR 600–31.

■■ The retention of a soldier on active duty as authorized by AR 635–200, "when an investigation of his conduct has been initiated with a view to trial by court-martial," seems to go beyond the extension of court-martial jurisdiction authorized specifically by paragraph 11d of the Manual, which refers to "commencement of action with a view to trial—as by apprehension, arrest, confinement, or filing of charges." We need not seek to reconcile the two provisions, for we perceive no intent by the President to preempt by paragraph 11d, which concerns termination of military jurisdiction, the power of the various Services to prescribe regulations which establish grounds for retention of a service person on active duty in connection with an ongoing investigation.[7] Of course, once validly prescribed, such regulations become an implicit term of the orders under which a guardsman is ordered to active duty—and so are encompassed within the State's consent to such orders. It also follows that if a Service does not comply with the regulations under which it seeks to extend a guardsman's tour of duty, it has exceeded the scope of the State's consent, so, under constitutional and statutory principles, the servicemember cannot be retained on active duty,[8] and a court-martial convened under

7. While retained on active duty a servicemember is subject to the Uniform Code. See Article 2, Uniform Code of Military Justice, 10 U.S.C. § 802. Paragraph 11d of the Manual for Courts-Martial, United States, 1969 (Revised edition) provides authority for retaining a servicemember on active duty so that he remains subject to military jurisdiction. Moreover, it also seems to contemplate that court-martial jurisdiction, having once attached, continues even if an accused is released from active duty. See United States v. Schuering, 16 U.S.C.M.A. 324, 330, 36 C.M.R. 480, 486 (1966); United States v. Rubenstein, 7 U.S.C.M.A. 523, 22 C.M.R. 313 (1957); Perlstein v. United States, 151 F.2d 167 (3rd Cir. 1945), cert. dismissed as moot, 328 U.S. 822, 66 S.Ct. 1358, 90 L.Ed. 1602 (1946).

8. United States v. Peel, supra; United States v. Hudson, 5 M.J. 413 (C.M.A.1978). If the servicemember is retained on active duty illegally, various remedies may be available to him. See United States v. Douse, 12 M.J. 473, 481 (C.M.A.1982) (Everett, C. J., concurring in the result).

the Uniform Code has no jurisdiction to try the guardsman.[9]

### III

The Government relies upon two actions taken on or before November 18, 1977, to sustain its position that the requisite action with a view to trial was timely taken. The first is the CID interview on November 16, at which appellant was formally advised that he was a suspect in the investigation of the instant offenses. The second is the "flagging" of appellant's personnel file to prevent any favorable personnel actions.[10]

As we have observed in the preceding part of this opinion, appellant's active duty period could have been validly extended under paragraph 2–4 of AR 635–200, and the military authorities at Fort Belvoir attempted to do this by completing and forwarding a "Report for Suspension of Favorable Personnel Actions" indicating the reason for the suspension.[11] See paras. 1h, 2a (3), 3a(2) and (3), and 5a(3), AR 600–31 (February 21, 1974). The report indicated that a "CID investigation" had been initiated against appellant and certainly this investigation—which by then was well underway—would constitute initiation of an investigation of misconduct with a view toward trial by court-martial within the purview of paragraph 2–4 of AR 635–200. However, the record does not reveal that within the "30 days beyond the expiration of his term of service ... the personal approval of the general court-martial convening authority" was given for Self's ex-

tension, as required by that same provision of the regulation.[12] Therefore, the retention of appellant on active duty subsequent to this 30 day period was of questionable validity, insofar as it was based on AR 635–200.

■ We turn next to paragraph 11d of the Manual to determine if military jurisdiction had attached and therefore continued—whether or not a formal extension of the tour of active duty was accomplished under AR 635–200. In interpreting the Manual's reference there to "commencement of action with a view to trial," we are mindful of our observation in *United States v. Smith*, 4 M.J. 265, 267 (C.M.A.1978), that

> [i]t must be such that one can say that at some precise moment the sovereign had authoritatively signaled its intent to impose its legal processes upon the individual. For that to be the case, that action, whatever it is, must have been *official*.[13]

In the case at bar, it is clear that, on the basis of Rausch's information, the CID had actively begun its investigation of appellant's involvement in the car fire prior to the expiration date of his term of service. Of course, an investigation by an agency like the CID is not always conducted with a view to prosecution, and even when the investigation concerns a crime, it may not be focused on a particular suspect. However, when a criminal investigation reaches the point where the guilt of a particular suspect seems particularly clear and it is highly likely that he will be prosecuted, we

---

**9.** Perhaps under state law a guardsman would be subject to trial by a court-martial convened under state authority; but such proceedings would be completely apart from the Uniform Code of Military Justice and would have no federal aspects.

**10.** The "flagging" action occurred on November 18, 1977, and there is a question as to whether under appellant's self executing orders, he was released from active duty at the beginning or end of that day. See n.2, *supra.*

**11.** As noted earlier, we have some question as to whether AR 600–31 was intended to encompass an involuntary retention on active duty. See n.6, *supra.* However, this document seems adequate to document that the tour of active

duty was being extended, as authorized by paragraph 2–4 of AR 635–200.

**12.** The requirement of personal approval by the general court-martial authority concerned is a protective measure designed to safeguard against unwarranted extensions of tours of active duty. See Roberts v. Vance, 343 F.2d 236, 239 n.8 and text thereto (D.C.Cir.1964).

**13.** We need not consider in the case at bar whether the official action required by *United States v. Smith, supra,* must have been known to the accused. Appellant was fully aware at the time of the acts on which the Government now relies to uphold jurisdiction.

believe that the investigative actions can fulfill the requirements of paragraph 11*d* of the Manual even though no formal charges have been preferred.

■ In *United States v. Wheeley*, 6 M.J. 220, 221 (C.M.A.1979), the accused had been taken to the staff sergeant's office, where he was "advised of his Article 31, UCMJ, [10 U.S.C. § 831] and *Miranda/Tempia*[14] rights, and of the nature of the offenses under investigation." The Court concluded that, since the accused had been "apprehended" and informed of the nature of the offenses being investigated, this constituted "action with a view to trial" within the contemplation of paragraph 11*d* of the Manual. The case at bar is similar, for, although here appellant had not been physically transported to the CID Office on November 16, he had been called in as a suspect. Thus, as we observed in *United States v. Tempia*, 16 U.S.C.M.A. 629, 636, 37 C.M.R. 249, 256 (1967):

> Here, the accused was clearly summoned for interrogation. Had he not obeyed, he would have undoubtedly subjected himself to being penalized for a failure to repair. Code, *supra*, Article 86, 10 U.S.C. § 886; Manual for Courts-Martial, United States, 1951, paragraph 127*b*. In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action. *See People v. Kelley* [66 Cal.2d 232], 57 West's Cal.Rptr. 363, 424 P.2d 947 (1967).

Under these circumstances requiring Self to report to the CID office was very similar to an "apprehension," which is specifically designated by the Manual as an "action with a view to trial." Since appellant was informed of the offenses for which he was suspected and then interviewed and since immediately after the interview he felt sure that he would be court-martialed and even anticipated spending 6 months in jail, we are convinced that at this point the investigation was being conducted with a view to his trial by court-martial. Therefore, authority existed to retain him on active duty. *See* para. 11*d*, Manual, *supra*.

■ Merely because the Manual provision does not cite as an example the summoning of a suspect for an interview by law enforcement officers does not mean that this could not constitute "action with a view to trial." Indeed, as we observed in *United States v. Wheeley, supra*, the paragraph 11*d* examples are not all-inclusive; other affirmative action can also be taken "with a view to trial." Any acts of military officials which authoritatively presage a court-martial, when viewed in the light of surrounding circumstances, are surely sufficient under paragraph 11*d* of the Manual for Courts-Martial to authorize retention on active duty for purposes of trial. Even if a trial by court-martial does not eventuate for one reason or another, clairvoyant positiveness has never been required.

Accordingly, we conclude that—considering the attendant circumstances—as of November 16, 1977, when the CID "targeted" appellant as a suspect, summoned him for an interview, apprised him of the charges, and advised him of his rights, the Army had taken sufficient "action with a view to trial," as contemplated by paragraph 11*d* of the Manual and *United States v. Wheeley, supra*, so that court-martial jurisdiction over appellant attached before expiration of his term of active duty.

The decision of the United States Army Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (dissenting):

Article 2, Uniform Code of Military Justice, 10 U.S.C. § 802, authorizes the exercise of court-martial jurisdiction by federal military authorities over a member of a state national guard when on active duty for

---

14. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v.* *Tempia*, 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967).

training in federal service.[1] It states that court-martial jurisdiction exists over

> [p]ersons lawfully called or ordered into, or to duty in or for training, in the armed forces, from the dates when they are required by the terms of the call or order to obey it.

Such language is a restatement of such court-martial jurisdiction as previously articulated in Article of War 2(a) (1917). *See* Manual for Courts-Martial, U. S. Army (1917), p. 3. *See also* Davis, *A Treatise on the Military Law of the United States* 479–80 (1913).

Appellant, a member of his State's National Guard, was ordered to active duty for training in federal service with the consent of his State's Governor. *See* 10 U.S.C. § 672(d). Consistent with the Article I, § 8, cl. 16 of our Constitution, both the appellant and his State's Governor necessarily consented to the exercise of this jurisdiction during his term of federal service. *See* 10 U.S.C. § 3499.

The Supreme Court and other federal courts, including this Court, have long interpreted congressional statutes concerning court-martial jurisdiction in light of the principle of attachment of jurisdiction. *See Lee v. Madigan*, 358 U.S. 228, 231, 79 S.Ct. 276, 278, 3 L.Ed.2d 260 (1959); *United States ex rel. Hirshberg v. Cooke*, 336 U.S. 210, 216–17, 69 S.Ct. 530, 533–534, 93 L.Ed. 621 (1949); *Carter v. McClaughry*, 183 U.S. 365, 383, 22 S.Ct. 181, 188, 46 L.Ed. 236 (1902); *Hironimus v. Durant*, 168 F.2d 288, 293 (4th Cir. 1948), *cert. denied*, 335 U.S. 818, 69 S.Ct. 40, 93 L.Ed. 373 (1948); *Barrett v. Hopkins*, 7 F. 312 (C.C.D.Kan.1881); *United States v. Sippel*, 4 U.S.C.M.A. 50, 54, 15 C.M.R. 50, 54 (1954); *United States v. Mansbarger*, 20 C.M.R. 449, 453 (A.B.R. 1955). In my opinion, this jurisdictional principle is equally applicable to the above portion of Article 2 which concerns a member of the state national guard on active duty for training in federal service.[2]

In light of the above, the question before this Court is whether court-martial jurisdiction attached or was exercised over appellant during the period of active duty authorized by his orders. *See United States v. Peel*, 4 M.J. 28 (C.M.A.1977). Both parties at trial stipulated that these orders expired on November 18, 1978. *Cf. United States v. Pearson*, 13 M.J. 140 (C.M.A.1982); *United States v. Hudson*, 5 M.J. 413, 420–23 (C.M.A.1978) (Fletcher, C. J., concurring in the result). In my opinion, neither the administrative action of flagging appellant's personnel record nor the investigation of appellant as a suspect by CID agents constitutes institution of criminal proceedings sufficient for the attachment of court-martial jurisdiction.[3] *United States ex rel. Hirshberg v. Cooke, supra* at 216–17. *See United States v. Smith*, 4 M.J. 265, 267 (C.M.A.1978) (Fletcher, C. J., concurring in the result); Winthrop, *Military Law and Precedents* 90–91, 96 (2d ed. 1920 Reprint).

1. *See* 96 Cong.Rec. 1365 (1950); Hearings Before a Subcommittee of the House Committee on Armed Services, 81st Cong., 1st Sess., on H.R. 4080, Index and Legislative History, Uniform Code of Military Justice, 328–329 (1949).

2. In *United States v. Hutchins*, 4 M.J. 190, 192 (C.M.A.1978), this Court stated that paragraph 2–4, AR 635–200, c.43 dated April 10, 1974, "has no effect on court-martial jurisdiction." Moreover, there are potential constitutional and statutory questions raised in the retention of a member of a state national guard on active duty on the basis of this regulatory provision without the express consent of the State Governor. *See United States v. Peel*, 4 M.J. 28 (C.M.A.1977). Therefore, I cannot associate myself with the majority's doctrine of implied consent as first espoused in *United States v. Hudson*, 5 M.J. 413, 417 n. 8 (C.M.A.1978).

3. Paragraph 11d, Manual for Courts-Martial, United States, 1969 (Revised edition), is an exposition of the principle of attachment as applied to Article 2, Uniform Code of Military Justice, 10 U.S.C. § 802. *United States v. Sippel*, 4 U.S.C.M.A. 50, 53, 15 C.M.R. 50, 53 (1954); *United States v. Brown*, 13 C.M.R. 856, 860 (A.F.B.R.1953). In this light, the words "filing of charges" should be understood in terms of the full requirements of Article 30(a) and (b), UCMJ, 10 U.S.C. § 830(a) and (b).