Airman Basic Shonnon D. WILSON,
FR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, Petitioner,

v.

Brig. General Robert J. COURTER, Commander, 37th Training Wing, Lackland Air Force Base, Texas, and the United States, Respondents.

Misc. Docket No. 97-02.

U.S. Air Force Court of Criminal Appeals.

22 April 1997.

Before Panel Three, PEARSON, MORGAN, C.H., II and MORGAN, J.H., Appellate Military Judges.

## OPINION OF THE COURT

MORGAN, C. H., II, Judge:

On April 9, 1997, petitioner, who is in pretrial custody awaiting trial by general court-martial, filed a petition for extraordinary relief in the form of a writ of habeas corpus. In that petition he alleged that he was no longer in the Air Force, and hence was not subject to court-martial jurisdiction. After considering the submissions and arguments of the parties, including oral argument, we decline to grant the relief requested.

*Background*

On April 14, 1995, petitioner enlisted in the Air National Guard of the United States for a term of six years. He was ordered pursuant

to 10 U.S.C. § 672(d) and 10 U.S.C. § 511[1] to active duty to attend basic military training and technical school by Special Order ACJ–23, dated 21 July 1995, for the period 27 July 1995 until 1 November 1995. On October 18, 1995, petitioner allegedly committed one of the two offenses with which he is now charged, stealing $320 from a fellow basic airman. On October 19, 1995, petitioner allegedly deserted the Air Force, and remained so until he was apprehended by San Antonio civil authorities on November 30, 1996.

What took place in the meantime in the California Air National Guard is the focal point of petitioner's argument. Petitioner's parent unit in the California Air National Guard was the 234th Combat Communications Squadron (CCS). In paragraph 5 of ACJ–23, "Remarks," petitioner was attached to the 8129 Student Flight, Moffett Federal Air Field, California, for "discipline/administration." On November 3, 1995, after learning of petitioner's alleged absence without leave (AWOL) the commander of the 234th CCS, Major (now Lieutenant Colonel (Lt Col)) King, by authority of the Secretary of the Air Force, amended the period of the original active-duty order, ACJ–23, from 1 November 1995 to 31 December 1995.

At this point, the 8129 Mission Support Flight of the California Air National Guard, in the person of Master Sergeant (MSgt) Mikulovsky, took a hand in matters. Working his way, apparently on his own, through Table 1 of Air Force Instruction (AFI) 36–2911, *Desertion and Unauthorized Absence,* 8 Jul 1994, he saw that at the six month point, a deserter was to be "removed from unit rolls." Calculating from the alleged date of absence, October 19, 1995, Mikulovsky computed that, effective April 18, 1996, petitioner should be removed from unit rolls—and then decided, again without any consultation with legal or command authority, that removal from unit rolls meant discharge. He accordingly prepared Special Order AZ–96, 02 May 96, which purported to discharge petitioner from the California Guard and as a Reserve of the Air Force,

effective 19 Apr 96. The order was signed by Chief Master Sergeant (CMSgt) Ratliff, the noncommissioned officer in charge of the 8129 Personnel Support Flight, "By order of the governor." The stated authority for the discharge was AFI 36–2911.

Mikulovsky also prepared a DD Form 214, "Certificate of Release or Discharge." In that form Mikulovsky listed the authority for the separation action as AFI 36–2911, *Desertion and Unauthorized Absence,* and AFI 36–3208, *Administrative Separation of Airmen,* 14 Oct 94. In block 21, "SIGNATURE OF MEMBER BEING SEPARATED," Mikulovsky typed "MEMBER NOT AVAILABLE TO SIGN." In block 28, "NARRATIVE REASON FOR SEPARATION," he entered, "DESERTER DROPPED FROM UNIT ROLLS," and in block 24, "CHARACTER OF SERVICE," he entered "UNDER OTHER THAN HONORABLE CONDITIONS." Since petitioner was still unavailable, he mailed it to petitioner's home of record in California (although his father had told authorities that petitioner no longer lived there and he did not know where he was). Mikulovsky also prepared and signed a National Guard Bureau Form 22, styled "Report of Separation and Record of Service in the Air National Guard of the State of California and as a Reserve of the Air Force" which reported petitioner's "discharge" under other than honorable conditions.

On November 30, 1996, petitioner was apprehended by San Antonio authorities and placed into pretrial confinement. CMSgt Epp, the National Guard liaison at Lackland Air Force Base, contacted the 8129 Personnel Support Flight in the person of CMSgt Ratliff, the signatory to the discharge order. Ratliff informed him that petitioner had been discharged. Epp relayed this in due course to various base authorities and the confinement officer ordered petitioner's release. CMSgt Epp personally escorted petitioner off base, telling him he was now a civilian.

After petitioner's release, however, the base legal office looked into the factual circumstances of petitioner's discharge, and, upon learning what had actually happened in

---

1. *Sic.* In 1994 these sections were recodified to 10 U.S.C. § 12301 and 10 U.S.C. § 12103; re-spectively. Act of Oct. 5, 1994, P.L. 103–337, §§ 1662(b)(2), (e)(2), 1675(c)(1).

California, decided that petitioner had not really been discharged at all. Petitioner was again apprehended on January 7, 1997, and placed into pretrial confinement. Charges were preferred on January 9, 1997, a pretrial investigation was conducted from January 10–17, and on February 12, 1997, charges of desertion and larceny were referred to a general court-martial. At defense counsel's request, the military judge ordered an inquiry into petitioner's mental responsibility under R.C.M. 706 on February 18, 1997. On March 17, 1997, a petition for a writ of habeas corpus was filed in the United States District Court for the Western District of Texas, San Antonio Division, styled *Wilson v. Widnal*, SA–97–CA–0310.[2]

On March 27, 1997, following receipt of the preliminary conclusion of the mental responsibility board that petitioner was mentally competent to stand trial, the military judge conducted a pretrial hearing on the question of jurisdiction. After listening to testimony and considering the written and oral arguments of counsel, along with a stipulation of fact, the military judge issued her decision on March 29, 1997, rejecting petitioner's claims, and set trial for May 7, 1997.

### Active Duty Status

■ As at trial, petitioner offers a bifurcated argument. His first is that he is no longer on active duty because the order calling him to active duty expired on November 1, 1995, and subsequent efforts to extend the period of active duty are in some fashion defective. This argument leans heavily on *United States v. Self*, 13 M.J. 132 (C.M.A. 1982). Accused of having burnt his car with

an eye towards insurance fraud, Self, who was an Army guardsman serving on active duty at the time of the crime, made much the same argument petitioner makes now. He argued that since his term of service on active duty as a national guardsman had expired by the time of trial, and Army officials had not taken definitive action against him with a view toward prosecution, the Army lacked *in personam* jurisdiction. Citing *United States v. Brown*, 31 C.M.R. 279, 1962 WL 4412 (C.M.A.1962), the Court declared that for guardsmen in Self's situation, jurisdiction was indeed lost once a period of active duty was over. Nevertheless, it held against Self's claim because it found that there were statutory and regulatory mechanisms which could validly extend a guardsman's period of active duty. In Self's case, an Army regulation providing for the involuntary extension of active duty where action was being taken with a view towards court-martial was sufficient where the Army had, in fact, taken such action before the expiration of Self's active duty status. The Court also mentioned in dictum that 10 U.S.C. § 972, which provided for the make-up of bad time lost by an unauthorized absence, supplied sufficient authority for the involuntary extension of active duty time.

Both parties have exhaustively briefed whether the various orders cut by the sedulous MSgt Mikulovsky purporting to extend petitioner's active duty were valid, and whether the government took sufficient measures with a view toward court-martial. All center on whether the strictures of *Self* were satisfied. From a jurisdictional point of view, at least, this focus is misplaced. In

---

2. Counsel for petitioner did not argue that his action in bringing application for a writ of habeas corpus before an Article III court divested this Court of jurisdiction. As a general rule, acts of a court-martial within the scope of its jurisdiction should neither be controlled nor reviewed in the civil courts. *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). Implicit in the congressional scheme embodied in the UCMJ, wherein a civilian Court of Appeals for the Armed Forces sit at the apex of an integrated system of judicial and appellate review, is the "view that the military court system generally is adequate to and responsibly will perform its assigned task." *Id.* at 758, 95 S.Ct. at 1313. This conclusion is reinforced by the availability

of review of a courtmartial conviction through writ of *certiorari*, an option not available at the time of *Councilman*. 28 U.S.C. § 1259. In the case of an attack on *in personam* jurisdiction, our superior Court has observed in dictum that authority is vested mutually in military and Article III courts, but that applications to the latter might well become a "relic" with the *certiorari* avenue now available. *United States v. Cole*, 24 M.J. 18, 27 (C.M.A.) (Cox, J., concurring), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987). In all events, whatever disposition is made of the Article III application, we are confident that it does not deprive us of jurisdiction to listen to, and rule upon, petitioner's application to this Court.

1986, Article 3 of the UCMJ, 10 U.S.C. § 803, was amended to add subsection (d). That subsection, in obvious reference to the *Self* line of cases, laid the active duty status issue to rest once and for all. It says:

A member of a reserve component who is subject to this chapter is not, by virtue of the termination of a period of active duty or inactive-duty training, relieved from amenability to the jurisdiction of this chapter for an offense against this chapter committed during such period of active duty or inactive-duty training.

At the time of the alleged offenses, petitioner was serving in his Federal status on active duty pursuant to 10 U.S.C. § 12301(d). Hence, for *jurisdictional* purposes, his continuation on that status subsequently, or even its expiration, is irrelevant. *See also United States v. Ernest*, 32 M.J. 135, 139 (C.M.A.1991). The manifold infirmities in the preparation of the various orders aimed at extending this period of duty do not obscure the reality that petitioner was on Federal active status at the time of the alleged offenses. *Id.*

A related, but not jurisdictional, question is whether, once petitioner was apprehended for the second time on January 7, 1997, respondents were obliged to extend his active service in order to bring him to trial. Petitioner argues that he was not validly still on active status at the time of his apprehension. According to his argument, his original active duty orders only extended to November 1, 1995, leaving at most only 13 days left at the time he allegedly departed the base without authority. Conceding that those days did not pass during his alleged desertion, petitioner argues that the clock restarted when he was apprehended on November 30, 1996 and continued to run through his second apprehension on January 7, 1997. Consequently, petitioner concludes, the Air Force was obliged to extend his active duty for purposes of trial.

A member of a reserve component must be on active duty prior to arraignment. R.C.M. 204(b)(1). It is pertinent, therefore, to ask whether petitioner was on active duty Federal status at the time of his second apprehension. If not, then the Air Force was required to recall him to active duty in accordance with Article 2(d), UCMJ, 10 U.S.C. § 802(d). On the other hand, if he were on active duty status, it is well settled that apprehension is sufficient action taken with a view toward trial to attach jurisdiction. *See* R.C.M. 202(c).

Leaving aside, for now, the question of whether petitioner was discharged, we are satisfied that he was on active duty Federal status at the time of his second apprehension, and hence, that he remains so. *See* R.C.M. 202(c)(1) (when jurisdiction attaches over a servicemember on active duty, the servicemember may be held on active duty over objection pending disposition of any offense for which held and shall remain subject to the code during the entire period).

Three orders were cut purporting to extend petitioner on active duty Federal status. The first, accomplished at the direction of Lt Col King, petitioner's National Guard unit commander, is ACJ–3, dated 3 Nov 95, which extends the original order calling petitioner to active duty through December 31, 1995. This order appropriately recites the Secretary of the Air Force as the authorizing official. The next two, handiwork of MSgt Mikulovsky, AZ–31, dated 15 Jan 97, and ACZ–2, 3 Feb 97, purport to extend the period to 30 Mar 97 and 31 May 97, respectively. Both of the Mikulovsky orders recite the governor of California as the authorizing official, prompting petitioner to dispute their validity. Without deciding the validity of those two orders, it is sufficient that we are satisfied that Lt Col King's order, with the Secretary of the Air Force cited as the authority, was sufficient to extend petitioner's active duty. Petitioner's argument that the order was invalid as a *nunc pro tunc* abridgement of his constitutional rights is unavailing, since, at the time the King order was cut, petitioner remained on active status notwithstanding the expiration of the original order calling him to active duty. *Cf. Self*, 13 M.J. at 135 (such orders may not be used to revive a jurisdictional status which has already *lapsed* at the time of the order).

Even assuming then, as petitioner argues, that the clock restarted when he was *first* apprehended on November 30, 1996, he was

still on active duty Federal status at the time of his second apprehension since only 39 days elapsed of the total of 74 days remaining on his amended order.

### Legal Effect of 8129 Student Flight (California Air Guard) Discharge Papers

█ Notwithstanding the above discussion, it is plain that if petitioner has been validly discharged from Federal service in accordance with law or regulations promulgated by the Secretary concerned, he is no longer amenable to court-martial jurisdiction and the writ must issue. Article 2(c)(4), UCMJ, 10 U.S.C. § 802(c)(4); *United States v. Howard,* 20 M.J. 353 (C.M.A.1985). This is true, even if the issuance of a properly issued discharge certificate is a mistake. *Cole,* 24 M.J. at 26 (C.M.A.), *cert. denied,* 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987); *Vanderbush v. Smith,* 45 M.J. 590 (Army Ct.Crim.App.1996). Here, the trial judge decided that the discharge in petitioner's case was not merely a mistake, but was a "nullity." We agree for the following reasons.

█ Since petitioner's enlistment had not expired, nor had his active duty Federal status expired while he was allegedly absent without authority, the validity of the discharge should be tested against the three-part test of our superior Court in *United States v. King,* 27 M.J. 327, 329 (C.M.A. 1989). There the Court held that such a discharge had three requisites: (1) delivery of a valid discharge certificate; (2) a final accounting of pay; and (3) undergoing the clearing process required under appropriate service regulations to separate a servicemember from military service. Petitioner's discharge meets none of these criteria.

█ We begin by restating the obvious. There is nothing talismanic about a DD Form 214. The discharge it memorializes must be a *valid* discharge, that is, it must be issued by competent authority, or if by delegation from that competent authority, according to the requirements and limitations of that delegation. *United States v. Garvin,* 26 M.J. 194 (C.M.A.1988). A personnel clerk is not a competent discharge authority, although he may be permitted to prepare a DD Form 214 in compliance with a specific delegation of authority or in accordance with an applicable regulation, instruction, or directive. *Compare United States v. Howard,* 20 M.J. 353 (C.M.A.1985) (decision to give member discharge certificate early made by competent discharge authority) *with United States v. Batchelder,* 41 M.J. 337 (1994) (personnel clerk's unauthorized early delivery of otherwise valid DD Form 214 held not effective.)

MSgt Mikulovsky testified that he misunderstood AFI 36–2911, Table 1, the regulation dealing with the administrative processing of desertions and unauthorized absences, to require discharge at the six month point of petitioner's allegedly unauthorized absence. What the regulation actually requires the servicing military personnel facility to do is to "Initiate AF Form 2098 to drop [the] absentee from the unit rolls." Mikulovsky prepared the requisite AF Form 2098s, but then strode well beyond the boundaries of the regulation to prepare Special Order AZ–96, the DD Form 214, and the NGB Form 22. These documents corroborate Mikulovsky's story that he mistakenly believed AFI 36–2911 to require a discharge, because all three list AFI 36–2911 as the authority for discharge. We note further that, upon discovery of the mistake, MSgt Mikulovsky cut special order AZ–31, 17 Dec 96, revoking AZ–96, the discharge order. *Cf. Garvin,* 26 M.J. at 196 (Cox, J., concurring) (issuance of discharge certificate without *actual* authority an *ultra vires* act and does not terminate jurisdiction.)

Mikulovsky also cited AFI 36–3208 as an authority for discharge. That regulation concerns the procedures for administrative discharge, and expressly requires that Air National Guard members serving on active duty first be released from active duty and then processed for discharge according to the appropriate National Guard regulation, in this case AFI 36–3209. AFI 36–3209 echoes the admonition in AFI 36–3208—that guardsmen serving on active duty in Federal status must first be relieved of that status before they can be processed for discharge by Guard authorities. Consequently, there was no competent authority authorizing MSgt Mi-

kulovsky to discharge petitioner. In so holding, we specifically reject petitioner's contention that his assignment to the 8129 Student Flight for administrative and disciplinary purposes constituted a "waiver" by the Secretary of the Air Force of her authority with respect to the discharge of airmen on active Federal service. It is quite clear that "no member may be discharged or released before expiration of term of service (ETS) except as prescribed by the Secretary of the Air Force, by sentence of court-martial, or as otherwise prescribed by law." AFI 36–3208, ¶ 1.1.1.[3]

Petitioner has offered us another reason to accept the validity of the discharge—the California Military and Veterans Code, §§ 260–261, authorizing administrative separation of Guard enlisted personnel when they have been absent without authority for 90 days. There are two problems with this approach. The first, adverted to above, is that while petitioner was in active Federal status, the State of California was incompetent to effect his discharge. U.S. CONSTITUTION, Section 8, cl. 15; Art. 2(c), UCMJ, 10 U.S.C. § 802(c); *Self,* 13 M.J. at 135. The requirement to effect discharges consistent with Federal law and regulation is acknowledged in the California Military and Veterans Code at § 261(a). To the extent there is conflict (and we see none) Federal statutory and regulatory law trumps any inconsistency arising from California law and procedures pertaining to the National Guard.

The second is that, even if California were competent to effect such a discharge, petitioner's discharge did not even comply with applicable California law. Neither CMSgt Ratliff nor MSgt Mikulovsky possessed the delegated authority from the governor to approve a discharge for unauthorized ab-

sence, and a discharge under other than honorable conditions was not authorized. California Military and Veterans Code, § 271(b) (adjutant general, on behalf of governor, authorized to discharge AWOL individual with general discharge under honorable conditions); AFI 36–3209, ¶ 1.4.1. (adjutant may further delegate authority for general discharge to commander in grade of O–6 or higher.)

Of course, there are other problems with the discharge certificate. It purports to issue petitioner a discharge under other than honorable conditions. Both for active duty and Guard airmen, such a discharge, to be approved, must first be recommended by an administrative discharge board, or the board must be specifically waived by the member. AFI 36–3209, ¶ 3.21; AFI 36–3208, ¶ 6.2.2. Petitioner's argument that the character of the discharge can be decoupled from the fact of it, while ingenious, does not deflect us from our conclusion that the discharge certificates and order were void *ab initio* as they were issued without competent authority and in violation of applicable law and regulations.

The second and third prongs of *King* are likewise unmet here. There is no evidence that petitioner ever received a final accounting of pay. In fact, the military judge found that he had on three occasions drawn casual pay since being returned to military control. He has never formally out-processed.

### Conclusion

We hold that petitioner was validly on active-duty in Federal status when he allegedly left military control without authority on October 19, 1995, and that he was then subject to court-martial jurisdiction for any crimes committed while in that status.[4] We

---

**3.** Elsewhere the instruction cautions, "as a rule, do not separate in absentia airmen absent without authority.... The GCM authority, or a higher authority, must approve discharge in absentia." *Id.* at ¶ 1.12.

**4.** During oral argument, counsel for petitioner hinted that he had come upon a new theory attacking personal jurisdiction, having to do, apparently, with whether petitioner was mentally competent to enlist in the first place. This theory was neither briefed nor argued before us, nor before the trial judge. While our review of the

unauthenticated record of trial shows that, while the issue of mental capacity has been raised, and a board has apparently decided that petitioner was mentally competent at the time of the alleged offenses, and at the time of trial, we detect no hint that the question of mental competency to *enlist* has been raised before the trial court. Of course, if it were found that petitioner lacked the capacity to understand the significance of his enlistment, there would be serious question as to his amenability to court-martial. *See* Article 2(b), UCMJ, 10 U.S.C. § 802(b), *but see* Article

further hold that petitioner remained on active Federal status during the duration of his allegedly unauthorized absence, and that he held such status on January 7, 1997, when he was apprehended. Absent a valid discharge, petitioner remains in such status through the disposition of the charges *sub judice* throughout any trial, appeal, and for purposes of punishment.

Accordingly, the petition for extraordinary relief in the form of a writ of habeas corpus is

DENIED.

Judge J.H. MORGAN concurs.

PEARSON, Senior Judge (concurring in the result):

I concur in denying the petition but would do so without addressing the merits of petitioner's jurisdiction claim.

During oral argument, petitioner's counsel stated that if we denied the writ of habeas corpus, he intended to contest personal jurisdiction on yet another ground when trial resumed on May 7, 1997. According to counsel, he had evidence that petitioner lacked the mental competence to enlist or voluntarily submit to military authority under Article 2(b) and (c)(2), Uniform Code of Military Justice (10 U.S.C. § 802(b), (c)(2)). Thus, the majority decides only a fraction of a larger *in personam* jurisdiction issue not yet ripe for full review. In doing so, the majority encourages defense counsel to parcel out issues at trial.

More importantly, though, a trial court presently exercises jurisdiction over this case. Out of respect for that court, we should force defense counsel to argue all aspects of the jurisdiction issue to it, giving that court a fair opportunity to resolve the entire *in personam* question before adding our two cents worth. In other words, we should require defense counsel to exhaust

remedies in the court below before moving up the chain.

For over a century, federal courts have applied the exhaustion of remedies doctrine when considering habeas corpus petitions filed by state prisoners contesting either the fact or length of their confinement. Under that doctrine, state prisoners must first exhaust state judicial remedies by presenting the highest state court available with a fair opportunity to rule on the merits of the issue they seek to raise in federal court. *Granberry v. Greer,* 481 U.S. 129, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987); *McQuown v. McCartney,* 795 F.2d 807 (9th Cir.1986). In 1948, Congress codified the doctrine which exists today in 28 United States Code § 2254.

This concept of exhaustion of remedies avoids "unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution" and promotes mutual respect. *Granberry,* 481 U.S. at 133, 107 S.Ct. at 1675. Equally important, fully exhausted claims usually produce a more complete factual record. *Rose v. Lundy,* 455 U.S. 509, 519, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982).

While we clearly have authority to devour the piece of the jurisdiction pie petitioner's counsel has served us, we should give the trial court the first crack at the whole which will avoid unnecessary conflict between the trial and appellate levels and promote respect for our trial courts. Consequently, I would deny the petition without prejudice, and require petitioner to litigate all of his jurisdictional issues in the trial court before knocking at our door.

---

2(c), UCMJ, 10 U.S.C. § 802(c) (disability at enlistment may be overcome during service so as to effect constructive enlistment). We can only decide issues properly before us. On the basis of the submissions and arguments of the parties, we have assumed in the absence of any evidence to the contrary that petitioner was lawfully enlisted and that he was competent to do so. While we

share our concurring brother's distaste for piecemeal litigation, we would be remiss in our statutory charter, had the petition been meritorious, to have allowed petitioner to languish illegally in jail for the failure of his lawyer to consolidate his claims into one action. For the present, at least, we do not have the problem before us.